## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| US WIND INC., | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-19-02984 |
| | * | |
| INTERMOOR, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

This case involves a dispute regarding maritime services contracts.  Although the case has been pending since 2019, in early 2021, Plaintiff US Wind Inc. ("US Wind") filed a motion seeking leave to file a Second Amended Complaint ("SAC") to add a new defendant, American Global Maritime, Inc. ("AGM").  ECF 75.  That motion was granted, and the SAC was filed on February 16, 2021.  ECF 93.  AGM has now filed two motions, a Motion to Transfer Venue, ECF 115, and a Motion for Judgment on the Pleadings, ECF 120.  I have reviewed those motions and the various responsive filings.  ECF 131, 133, 139, 140, 142.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons set forth herein, AGM's motions will be denied.

### I.     Background

The following facts are derived from the SAC and the exhibits attached thereto.  US Wind, a company with offices in Baltimore, Maryland, is building a wind farm off the coast of Ocean City, Maryland.  ECF 93 ¶ 1, 9.  US Wind is contractually obligated to make "certain progress on the development and installation of the proposed windfarm."  *Id.* ¶ 9.

In connection with the project, US Wind needed to install a Met Mast Tower ("Met Mast") in the wind farm area.  *Id.* ¶ 10.  In 2018, US Wind custom ordered a $3.2 million Met Mast from a company based in Louisiana.  *Id.* ¶ 11.

To protect its interests, US Wind's insurer, Aon, required that US Wind retain a Marine Warranty Surveyor ("MWS") to assess the feasibility of its plans for various stages of the wind farm project, including the suitability of the vessels to be used.  *Id.* ¶ 15.  In March, 2019, US Wind asked AGM to provide a quote to serve as the MWS.  *Id.* ¶ 16.  The scope of work to be performed by the MWS included evaluating "weather criteria and adverse weather definitions for all major load-out and installation activities" and "surveys of and approve all installation vessels used on the project."  *Id.* ¶ 18.  AGM confirmed that "each vessel will be issued a report with a statement of suitability and details of our findings and comments."  *Id.* ¶ 19.  The MWS work was intended to be performed "per the Code of Practice of the Joint Rig Committee (JR2016-013)."  *Id.* ¶ 20.

US Wind's prime contractor on the wind farm project, InterMoor, Inc., hired a Louisiana company, All Coast, LLC ("All Coast"), which owned a Class 250' liftboat, the *Great White.  Id.* ¶¶ 51, 55.  InterMoor employed the *Great White* to carry and install the "alignment frame" which would be necessary for the installation of the Met Mast.  *Id.* ¶ 55.  All Coast sent a voyage plan to InterMoor on August 8, 2019, which stated that the *Great White*'s captain would operate the vessel in accordance with its Marine Operations Manual approved by the US Coast Guard.  *Id.* ¶ 66.  However, InterMoor never compared the sea/weather criteria listed in the *Great White*'s Marine Operations Manual with the expected weather conditions to be experienced during the time surrounding the anticipated installation.  *Id.* ¶ 67.  To that end, both MAP Corporation ("MAP") a consultant to US Wind, and All Coast had informed InterMoor that the weather conditions relevant

to the project would get worse "with every day that goes by" in the August/September time frame. *Id.* ¶ 68.

On or about August 13, 2019, AGM completed its review and issued a Certificate of Approval for the sailaway of the *Great White*. *Id.* ¶ 37. The *Great White* departed Louisiana for the project site on August 14, 2019, with its voyage anticipated to take 14 days. *Id.* ¶ 63. However, the *Great White* did not arrive timely because it stopped twice as a result of adverse weather conditions. *Id.* ¶ 64. Both InterMoor and US Wind disagreed with the *Great White*'s captain about the need to enter safe harbor in St. Simons, Georgia from August 28 to September 7. *Id.* ¶ 65. In the end, the *Great White* did not reach the Maryland site until September 12, 2019. *Id.* ¶ 63.

Two days later, on September 14, 2019, InterMoor first requested information from All Coast about the "weather window for the *Great White*." *Id.* ¶ 70. On September 16, 2019, the *Great White*'s captain again decided to transition to shallow waters based on the weather forecast. *Id.* ¶ 71. On September 20, All Coast represented that the *Great White* would be willing to travel to the project site but "upon arrival, there is no guarantee that we will be able to jack up within the vessel's limitations." *Id.* ¶ 73. Ultimately, the captain of the *Great White* did not find a weather window in September in which he could safely install the alignment frame in accordance with the vessel's Marine Operations Manual. *Id.* ¶ 90. As a result, US Wind was unable to complete the Met Mast installation as scheduled, causing it to incur significant losses. *Id.* ¶ 85.

US Wind essentially alleges that AGM's review should have determined that the *Great White* was unsuitable for its task, because its Marine Operations Manual prohibited its relevant operation in the weather conditions that should have been anticipated. Specifically, US Wind alleges that AGM "expressly warranted, through its review of documents and by the issuance of the Certificate of Approval for the Sailaway of Great White, that the installation of the Met Mast

was feasible using the Great White in September 2019," *id.* ¶ 184, and that AGM breached its agreement with US Wind when "after the Project's installation shifted to September 2019, [AGM] failed to update its review and certification of the Project's feasibility and the suitability of the *Great White*." *Id.* ¶ 188.  Finally, US Wind alleges that AGM breached its professional duty of care by "failing to provide notification to US Wind, prior to issuing the Certificate of Approval to Great White for sailaway, that the operational limitations of Great White, as provided in its Marine Operations Manual, combined with the weather conditions expected at the site, made it likely that the project will be unsuccessful," *id.* ¶ 196, and that AGM "did not even review the Marine Operations Manual for Great White, or the site weather conditions, prior to issuing the Certificate of Approval to Great White for sailaway." *Id.* ¶ 197.

## II.    Motion to Transfer Venue

### A. Legal Standard

Under 28 U.S.C. § 1404, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  District courts within this circuit consider "four factors when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trustees of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015).  "The burden is on the moving party to show that transfer to another forum is proper." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 733 (D. Md. 2017) (quotation omitted).

### B. Analysis

A review of the factors reveals that AGM, as the moving party, has not met its burden.  The first factor, the plaintiff's choice of venue, "is entitled to substantial weight[.]" *Trustees of the Plumbers*, 791 F. 3d at 444 (quotation omitted).  The deference afforded that weight is heightened "where the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action."  *Kukich v. Electrolux Home Prod., Inc.*, Civ. No. ELH-16-3412, 2017 WL 345856, at *7 (D. Md. Jan. 24, 2017) (quotation omitted) (citing cases).  Here, US Wind filed this lawsuit in its home jurisdiction, Maryland.  Moreover, Maryland bears a substantial relation to the cause of action, because the target destination for the Met Mast was offshore Ocean City, Maryland.

AGM argues that the second and third factors, witness convenience and access and convenience of the parties, weigh in its favor.  In fact, AGM's co-defendant, InterMoor, filed a submission in support of AGM's motion.  ECF 140.  InterMoor and AGM are both Texas entities, meaning that the majority of their witnesses are Texas-based.  The parties disagree as to whether there will be a meaningful number of Maryland-based witnesses, but in any event, AGM and InterMoor have not demonstrated that any witnesses would be unavailable for trial in Maryland. Nevertheless, this Court will assume, arguendo, that the witness convenience factor favors transfer to Texas.

The third factor, "access and convenience of the parties," is essentially a draw.  This is a circumstance when transfer would "only shift the balance of inconvenience from defendants to plaintiff" because US Wind would bear the burden of the inconvenience if the case proceeds in Texas.  *See Dicken v. United States,* 862 F. Supp. 91, 93 (D. Md. 1994) (quotation omitted).

Finally, the fourth factor, the interests of justice, at this point weighs in favor of keeping this case in this Court.  This Court has presided over this matter since 2019 and has developed a

familiarity with the facts and the issues.  On balance, then, two of the four factors (including the most important, plaintiff's choice of venue) weigh in favor of retaining venue in Maryland, while one weighs in favor of transfer and one is neutral.  AGM, then, has not met its burden to demonstrate that transfer is warranted, and its motion will be denied.

### III.    Motion for Judgment on the Pleadings

#### A.  Legal Standard

"A Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule 12(b)(6)."  *Bierman Fam. Farm, LLC v. United Farm Fam. Ins. Co.*, 265 F. Supp. 3d 633, 637 n.5 (D. Md. 2017).  In assessing such a motion, then, the court must "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  The factual allegations of the complaint, assumed to be true, "must be enough to raise a right to relief above the speculative level[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The plaintiff's obligation is to show the "'grounds' of his 'entitle[ment] to relief,'" offering "more than labels and conclusions."  *Id.* (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  It is not sufficient that the well-pleaded facts suggest "the mere possibility" of liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Rather, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,'" meaning that the court could "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

#### B.  Analysis

AGM premises its motion for judgment on the pleadings on the notion that its standard Terms and Conditions were incorporated into its contract with US Wind.  In relevant part, AGM's

Terms and Conditions expressly provide (1) that AGM must be provided notice of any claim against it within 90 days of the completion of the work; and (2) that AGM's liability with respect to work it performs is capped at $50,000.  ECF 120-1 at 1.  Thus, if those Terms and Conditions apply in this case, US Wind's recovery would either be precluded as a result of its lack of timely notice or strictly limited to $50,000.

AGM concedes, however, that there was no reference to its standard Terms and Conditions in the Proposal it sent to US Wind for execution.  *See* ECF 142 at 3.  It further concedes that its standard Terms and Conditions were never provided to US Wind during the course of the parties' dealings.  *See id.* at 8-9.  Instead, it cites case law establishing that maritime contracts can be set forth in a series of separate documents.  *See, e.g.*, *id.* at 2.  AGM further posits that its Terms and Conditions were incorporated into the parties' contract in three separate ways: (1) by reference in the signature block of emails sent to US Wind by AGM; (2) by reference in the Certificates of Approval issued by AGM pursuant to the contract; and (3) by reference in AGM's invoices submitted to US Wind.[1]  ECF 120-1.  AGM suggests that the emails, the Certificates of Approval, and the invoices all became part of the parties' contract.  *Id.*

While contractual interpretation can, in many cases, be appropriate at the motion to dismiss stage because it presents a question of law, in this case, as to some of the points, there are relevant facts at issue with respect to ascertaining the content of the parties' agreement.  Initially, this Court disagrees with AGM's position as to the emails between the parties.  It is true that "clear reference

---

[1] This Court is also not persuaded by US Wind's argument that a notation it contained in its Purchase Order, "Terms & Conditions: N/A[,]" indicated a rejection of AGM's standard Terms and Conditions.  ECF 133 at 3-4.  US Wind had no knowledge of AGM's standard Terms and Conditions at the time it sent the Purchase Order, and it is clear on the face of the document that the notation simply indicated that US Wind did not intend to add its own Terms and Conditions to those contained in AGM's Proposal.

to a separate document" made by one party can cause that separate document to be incorporated into a contract, particularly in a contracting process between sophisticated business entities. *See, e.g.*, *Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, 514 Fed. App'x 365, 367-68 (4th Cir. 2013). However, no "clear reference" was made in AGM's emails, such that US Wind could fairly be on notice that the work performed by AGM might be subject to its Terms and Conditions. Under a bolded heading of "****CONFIDENTIALITY NOTICE****[,]" AGM's emails contain the following footer:

> This communication contains information which is confidential and may also be legally privileged or otherwise protected from disclosure. It is for the exclusive use of the intended recipient(s) or entity to whom it is addressed. If you are not the intended recipient(s) or entity please note that any distribution, copying or use of this communication or the information in it is strictly prohibited. If you have received this communication in error, please notify us by e-mail or by telephone and then delete the e-mail and any copies of it. Any views or opinions presented are solely those of the author and do not necessarily represent those of Global Maritime. By accepting this communication, you agree that you have read this confidentiality notice and to be bound by the foregoing limitations and restrictions. All work undertaken subject to our standard terms and conditions of business (a copy of which is available on request). This communication is from American Global Maritime Inc. Registered in Texas No. 01441581-00.

ECF 133 at 7. The unclear language about "work undertaken" is buried in an incomplete sentence within an otherwise relatively standard confidentiality notice appearing at the footer of corporate emails. The reference, in fact, is so out of place that it is unclear whether "work undertaken" somehow refers to the communications discussed in every other sentence of the confidentiality notice or to any actual work to be performed by AGM. This Court, therefore, believes this case to be factually distinguishable from other cases in which similar language has been found to fairly incorporate other documents by clear reference into parties' business dealings.

With respect to the effect of the inclusion of references to the Terms and Conditions in the Certificates of Approval and the Invoices, more factual development is required to permit this

8

Court to determine whether those documents are fairly considered to be part of the parties' agreement or not.  In fact, there is no reference to the Invoices or any payments made pursuant to those Invoices within US Wind's Complaint.  This Court will therefore deny AGM's motion for judgment on the pleadings, although AGM will of course be permitted to renew its argument about the applicability of its Terms and Conditions once the circumstances surrounding the Certificates of Approval and Invoices have been explored in discovery.

### IV.    Conclusion

For the reasons set forth above, AGM's Motion to Transfer Venue, ECF 115, and Motion for Judgment on the Pleadings, ECF 120, will be DENIED.  A separate Order follows.


Dated:  September 20, 2021                                          _____/s/_____
                                                                    Stephanie A. Gallagher
                                                                    United States District Judge