## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| US WIND INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-19-02984 |
| v. | * | |
| | * | |
| INTERMOOR, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff US Wind, Inc. ("US Wind"), the developer of a windfarm off the coast of Ocean City, Maryland, brings this action against Defendant InterMoor, Inc. ("InterMoor"), one of US Wind's contractors for the windfarm project, alleging (1) breach of contract, (2) breach of warranty, (3) recission of contract, (4) unjust enrichment, and (5) tortious interference with prospective economic relationships.[1]  *See* Pl.'s Second Am. Compl., ECF 75-2.  InterMoor has filed a partial motion for summary judgment, ECF 166, a motion to impute knowledge of Graham Tyson to US Wind, ECF 167, and a motion to exclude the testimony of Michael Frampton, ECF 168.  US Wind filed its response in opposition to the motion for summary judgment, ECF 174, its opposition to the motion to impute knowledge, ECF 172, its opposition to the motion to exclude testimony, ECF 171, and its own motion in limine to exclude the opinions of Scott C. McClure regarding the offshore wind industry, ECF 173.  InterMoor replied to each of US Wind's

---

[1] US Wind also alleged breach of warranty, breach of contract, and breach of professional duty of care against a former defendant, American Global Maritime, Inc.; however, US Wind and American Global Maritime have settled.  *See* ECF 160.

oppositions, *see* ECF 188, 186, 155 respectively, and filed its response in opposition to US Wind's motion in limine, ECF 187.

This Court has reviewed the filings and has determined that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, InterMoor's motion to impute knowledge of Graham Tyson to US Wind will be granted in part and denied in part; InterMoor's motion to exclude the testimony of Michael Frampton will be denied; US Wind's motion in limine to exclude the opinions of Scott C. McClure regarding the offshore wind industry will be denied; and InterMoor's partial motion for summary judgment will be granted in part and denied in part.

## I.   BACKGROUND

The facts described herein are viewed in the light most favorable to US Wind as the non-moving party. *See Malinowski v. The Lichter Grp., LLC*, 165 F. Supp. 3d 328, 335 (D. Md. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008)).

In 2014, US Wind received federal leases for the Maryland Wind Energy Area (an area offshore Ocean City, Maryland) to construct one of the first offshore windfarms in the United States. ECF 75-2 ¶ 9. A first step in building an offshore windfarm is the installation of a meteorological mast – a tower that gathers information about site conditions and the operation of the wind turbines. *Id.* ¶ 10. US Wind first hired EPIC Applied Technologies ("EPIC") as an installation contractor to transport and install US Wind's newly constructed, $3.2 million meteorological mast. *Id.* ¶¶ 11, 12. The mast was built in Louisiana, so it required transport north along the eastern coast of the United States. *Id.* ¶ 11. Further, a lift boat was required to hoist the mast up and drive the mast into place in the seabed floor. A lift boat does what it advertises – once in place, it lowers its "legs" to the sea floor so that the boat can physically lift itself out of the water and remain stationary throughout the construction and installation process.

US Wind originally intended to have a lift boat depart Louisiana for Maryland around July 15, 2019. ECF 174-30 at 5. Unfortunately, EPIC fell into bankruptcy, leaving US Wind without an installation contractor. *Id.* ¶ 14. Nonetheless, much of the project was already underway. ECF 174-3 at 3. US Wind had already found a lift boat, the *Great White*, owned and operated by All Coast LLC ("All Coast"), *id.*, and two other contractors had previously reviewed the suitability of the vessel, ECF 168-5 at 7–8. Thus, US Wind continued with the installation project and sought to bring on as many of EPIC's former contractors and employees as possible. ECF 75-2 ¶ 49.

InterMoor was one of those contractors. On July 19, 2019, Graham Tyson, a client representative on secondment to US Wind, reached out to inquire whether InterMoor could continue its assigned duties of mobilizing the *Great White*, despite EPIC's departure from the project. ECF 174-3 at 3. InterMoor confirmed it would continue to support the project and work with US Wind directly, and it inquired whether there was "any additional support that InterMoor [could] provide," noting that the company has "an extensive track record of project management, transportation and offshore installation and have worked on these types of projects . . . on many occasions." *Id.* at 2. US Wind pursued InterMoor's offer, ECF 174-33 at 3, and over the next few days, the two companies pulled together a scope of work document outlining their respective roles and payment structure. ECF 174-4. By July 29th, US Wind and InterMoor entered into a Master Services Agreement ("Agreement"), ECF 174-1, and mobilization of the *Great White* got quickly underway.

Over the coming days and weeks, US Wind, InterMoor, All Coast, and other contractors worked to prepare the *Great White* for departure. *See* ECF 174-8, 174-9, 174-10, 174-12, 174-13. Importantly, though, InterMoor did not compare the operational limits of the *Great White* with the

expected weather conditions on site in offshore Maryland to ensure that the vessel was suitable and capable of performing the installation.  ECF 75-2 ¶ 67; ECF 174 at 19.

The lift boat embarked on its journey on August 14th, nearly a month after its originally planned departure.  ECF 174-10 at 3.  As it journeyed up the Atlantic, the *Great White* had to enter safe harbor twice to avoid hurricanes and unsuitable weather conditions.  ECF 75-2 ¶ 64; ECF 174-30 at 7.  On August 28th, Mr. Tyson emphasized his concern about the delays and the closing weather window, noting that starting in early September, only around half of the days would present weather conditions with less than 1-meter waves, the limiting condition for the lifts on the *Great White*.  ECF 172-4 at 2.  On August 29th, Mr. Tyson expressed further concerns to InterMoor about the weather delays, noting that "[w]ith every day that goes by, the typical weather on site gets worse, decreasing out change of having a suitable number of lifting days.  We may soon reach a point where we will never have enough good weather days to complete the job."  ECF 174-30 at 6.

The *Great White* finally arrived on site on September 12th.  ECF 75-2 ¶ 63; ECF 174-11.  Unfortunately, more problems ensued.  By mid-September, the likelihood of suitable weather for the *Great White* to install the meteorological mast was low.  On September 14th, InterMoor reached out to All Coast to inquire about the "weather window" for the *Great White*, asking about the vessel's limiting operation conditions.  ECF 174-14.  The *Great White*'s operations manual detailed its limitations for wind speeds and wave heights, which varied based on whether the lift boat was in transit, in lift, or operating its crane.  ECF 93-13 at 3.

The Captain of the *Great White* began expressing concern about his vessel's ability to complete the job with the upcoming forecast.  ECF 174-18.  On September 20th, the Captain explained that the ship needed a 24-hour window of suitable weather conditions to travel to the

site, complete the installation, and return safely back to shallow waters, but noted that no such window was in the forecast. *Id.* at 3. Further, the forecast predicted 3-to-5-foot waves, but the *Great White* could only operate its crane in seas of less than 3-foot waves. *Id.*; ECF 174-15 at 2. On September 22nd, the *Great White* retreated to the shallower waters of the Delaware Bay to await better weather. ECF 174-17 at 2.

There was some disagreement about whether the *Great White*'s operations manual actually prohibited the vessel from completing the job. At issue was the interpretation of the manual's sea conditions limits. The Captain of the *Great White* interpreted each of the listed sea conditions to be an independent limit. Thus, if the wave height limit was reached, the vessel could not operate, even if the wind speed was below its limit. InterMoor took the position that it could not override the Captain's interpretation. ECF 174-16 at 6. US Wind disagreed. After consulting with other contractors and the vessel's manufacturers, US Wind took the view that the operational limits were cumulative rather than individual. ECF 174-19 at 2. In other words, in its view, the vessel could operate until all limits were reached, not just one. US Wind requested that the operational limits of the vessel be reviewed and updated. ECF 174-16 at 5.

After a week without resolution, it became clear that the operational limits of the *Great White*—or at least the Captain's interpretation of those limitations—were unlikely to allow the vessel to complete the job, given the typical offshore weather conditions at that point in the season. ECF 75-2 ¶ 79. On September 26th, Salvo Vitale, the Country Manager for US Wind, emailed InterMoor to call off the project. ECF 174-16 at 2 ("Unfortunately it seems that, at present, there are not the conditions to continue – so it's useless to waste additional money."). US Wind requested that InterMoor arrange for the meteorological mast and associated structures to be unloaded in Baltimore, Maryland. *Id.*

That same day, the parties took steps to terminate the Agreement, but US Wind considered it a default termination, citing InterMoor's breach of contract, ECF 174-20, whereas InterMoor interpreted US Wind's actions as a voluntary termination, ECF 174-16 at 2. Communication continued to break down from there. InterMoor did not immediately respond to US Wind's request to have the meteorological mast dropped off in Baltimore, ECF 174-24 at 2, and when US Wind attempted to directly negotiate with InterMoor's subcontractors and bring them into the planning calls, InterMoor refused to allow them to participate, ECF 174-27 at 2. Further, in conversations with its subcontractors, InterMoor noted that it intended to hold US Wind's meteorological mast "hostage," because US Wind had outstanding invoices. ECF 174-21 at 3. It directed its subcontractors to forward communications from US Wind directly to InterMoor. ECF 174-22 at 3. Ultimately, no arrangements were made for the meteorological mast to be unloaded in the northeast, and the mast continued back to Louisiana. ECF 174-25 at 2. After litigation in multiple U.S. District Courts, US Wind eventually retrieved the mast and associated property, ECF 174 at 26, but the 2019 installation of the meteorological mast had failed.

This lawsuit ensued.

## II.   CHOICE OF LAW

A preliminary issue is what substantive law governs US Wind's contract and tort claims. Under the *Klaxon* doctrine, this Court is bound by Maryland's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "With limited exceptions, [Maryland law] has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied . . . ." *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 617 (2007); *cf.* 1 Admiralty & Mar. Law

§ 5:19 (6th ed.) ("The first determinant of choice of law is, in contract cases, the law specified by the parties.").

In this case, the parties' Agreement includes an applicable law provision, which provides, "[T]his Agreement shall be governed by and interpreted in accordance with general maritime law, but if general maritime law is not applicable, the laws of the State of Texas (exclusive of any principles of conflicts of laws which would direct application of the substantive laws of another jurisdiction) shall govern." ECF 174-1 at 18. Thus, general maritime law first applies. "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986). Where no general maritime law is on point, the laws of the State of Texas govern.

## III.   MOTION TO IMPUTE KNOWLEDGE

InterMoor seeks to impute, to US Wind, Graham Tyson's knowledge of the scope of work of US Wind's contractors, as well as his knowledge of the incongruity between the expected weather offshore Maryland and the operating limits of the *Great White*. ECF 167-1 at 1. InterMoor seeks to impute such knowledge so that it can argue that US Wind already knew the risks of sending the *Great White* north that late in the year and would have proceeded with the project regardless of InterMoor's assessment. ECF 182 at 4. InterMoor also hopes to impute Mr. Tyson's knowledge of the scope of work of the contractors to US Wind so that InterMoor can argue that US Wind delegated the suitability assessment to another contractor, demonstrating waiver of any such contractual requirement. *Id.*

"Federal maritime law embraces the principles of agency." *See Naviera Neptuno S.A. v. All Int'l Freight Forwarders, Inc.*, 709 F.2d 663, 665 (11th Cir. 1983) (citing *West India Industries,*

*Inc., v. Vance & Sons AMC-Jeep*, 671 F.2d 1384 (5th Cir.1982)).  The Restatement (Second) of Agency has been adopted in maritime law as an accurate statement of applicable general agency principles.  *See Stevens Tech. Servs., Inc. v. S.S. Brooklyn*, 885 F.2d 584, 589 (9th Cir. 1989).

Generally, "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal," unless the agent acts adversely to the principal or has a duty to not disclose the fact to the principal.  *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. L. INST. 2006); *see also* RESTATEMENT (SECOND) OF AGENCY § 278 (AM. L. INST. 1958) ("The principal is affected by the knowledge which the agent has when acting for him[.]").  Whether a principal-agent relationship exists is a question of fact.  However, US Wind agrees that "as the functional equivalent of an employee, Mr. Tyson could be considered an agent of US Wind for matters that fall within the scope of his duties."  ECF 172 at 1.  The parties therefore agree that Mr. Tyson acted as US Wind's agent.  Consequentially, under federal maritime law and principles of agency, Mr. Tyson's knowledge of facts material to his duties to US Wind are imputed to US Wind.

The remaining questions raised by InterMoor's motion—*i.e.*, the extent of Mr. Tyson's knowledge and whether such knowledge fell within his scope of agency—are questions of fact. *See* RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. c ("It is a question of fact whether an agent knows or has reason to know a fact . . . and when the fact, if known at that time, would be material to legal consequences for the principal.").  Both cases that InterMoor presents as examples of a court imputing knowledge occurred following a trial.  *See Shipco 2295 Inc. v. Avondale Shipyards, Inc.*, 631 F. Supp. 1123, 1125, 1133 (E.D. La. 1986), aff'd, 825 F.2d 925 (5th Cir. 1987) (imputing an agent's knowledge of a vessel's structural failure to the principal, regardless of actual knowledge, based on trial testimony, depositions, and documentary evidence); *New York Marine*

*& Gen. Ins. Co. v. Tradeline L.L.C.*, 266 F.3d 112, 120, 122 (2d Cir. 2001) (imputing an agent's knowledge of a vessel's location and the expected weather to the principal, on appeal and following a bench trial).

At this stage of litigation, in ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Although InterMoor presents evidence of Mr. Tyson's knowledge of certain facts, [2] and US Wind does not

---

[2] Specifically, InterMoor presents evidence (*e.g.*, depositions and emails) that Mr. Tyson knew, and therefore US Wind constructively knew, the following facts:

- It is normal for offshore construction activities to experience a period of time waiting on weather.
- It is anticipated in all offshore construction operations that weather could deteriorate to the point where the vessels involved would have to retreat from the installation project location.
- On August 22, 2019, the *Great White* was already subject to one day of weather delay, and more delays were expected due to the delay from Epic's bankruptcy, pushing the Project into worse weather windows.
- Weather at the installation site off the coast of Maryland deteriorates rapidly in mid-September.
- The *Great White*, cargo barge, and tug had to seek safe harbor a number of time during its transit from Louisiana to Maryland, including in St. Simmons, GA on August 29 due to Hurricane Dorian.
- It was expected to some extent that the transit of the *Great White* would be delayed because of unfavorable metocean conditions and the threat of hurricanes at the time.
- The delays affecting the Project's schedule and the rapid deterioration of the September weather conditions at the installation site had the potential to place the parties "in a window where the project is impossible to complete."

refute Mr. Tyson's specific statements made during deposition or in emails, this evidence does not lead to the broad factual conclusions espoused by InterMoor. The record indeed demonstrates that once the *Great White* had departed Louisiana and experienced multiple weather delays in late August, Mr. Tyson became increasingly worried about the success of the project given the fact that weather worsens later in the season. ECF 167-1 at 7. This fact is distinct, however, from InterMoor's broad assertion that Mr. Tyson knew it was "unlikely that the Project would be successfully completed in September 2019." The same goes for Mr. Tyson's understanding of the various contractors' roles. Although the record shows that Mr. Tyson worked with the different contractors, this does not demonstrate that Mr. Tyson "is deemed to have knowledge of the scope of work of contractors." ECF 167-1 at 16. InterMoor's requested factual conclusions, therefore, are overly broad and inapposite for summary judgment.

In sum, US Wind concedes that Mr. Tyson served as its agent, and pursuant to maritime law and the Restatement, Mr. Tyson's knowledge material to his agency will be imputed to US Wind. Thus, the portion of InterMoor's motion that seeks to establish Mr. Tyson as US Wind's agent is granted. To the extent that InterMoor's motion attempts to draw more precise conclusions

---

- Starting September 3, 2019, only 53% of all days were below 1m waves, which was the limiting condition for dynamic lifts on the *Great White*.
- By August 29, 2019, given the additional delay of Hurricane Dorian, it was evident that the parties were reaching a point where there would not be enough good weather days to complete the job that year.
- On August 6, 2019, Mr. Tyson received a copy of the *Great White*'s "Mission Specific Vessel & Equipment Survey" and its crane weather score card.

ECF 167-1 at 7–8. InterMoor also suggested that the record demonstrated that Mr. Tyson knew that "[w]ith every day that goes by toward the end of August – early September, the typical weather on site gets worse, decreasing the chance of having a suitable number of lifting days." *Id.* Although this alleged statement is related to others made by Mr. Tyson, InterMoor did not provide a cite to the record.

about Mr. Tyson's knowledge of the project's success and his understanding of which contractors were tasked with assessing the suitability of the *Great White*, such issues are disputed questions of fact best suited for resolution at trial, and that portion of the motion is denied.

## IV. MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standards

"A motion in limine is a request for guidance by the court regarding an evidentiary question." *Hunt Valley Baptist Church, Inc. v. Baltimore Cnty., Maryland*, No. 17-CV-804, 2018 WL 2717834, at *7 (D. Md. June 6, 2018) (unpublished) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983)).  Typically, pretrial motions in limine seek to exclude prejudicial evidence before it is offered at trial. *Changzhou Kaidi Elec. Co., Ltd. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987); *see also Changzhou Kaidi*, 102 F. Supp. 3d at 745 ("[Motions in limine] are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" (quoting *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013))).  Motions in limine further promote judicial efficiency by preserving the issues raised for appeal and eliminating the need for parties to renew their objections at trial, "just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996); *see* Fed. R. Evid. 103(a); *cf.* R. 103(a) advisory committee's note to 2000 amendment (acknowledging that Rule 103(a) "applies to all rulings on evidence . . . including so-called 'in limine' rulings").

Generally, courts should grant a motion in limine "only when the evidence is clearly inadmissible on all potential grounds." *Dorman v. Anne Arundel Med. Ctr.*, No. 15-1102, 2018 WL 2431859, at *1 (D. Md. May 30, 2018) (quoting *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017)).   Ultimately, rulings on these motions fall within the trial court's "broad discretion." *Kauffman v. Park Place Hospitality Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012); *see also United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (noting that evidentiary rulings fall within a trial court's discretion).

Both parties' motions aim to exclude the opposing side's expert witness.  Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance." *Daubert*, 509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361

F. App'x 448, 452 (4th Cir. 2010).   However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case.  *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation."  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)).  The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible.  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591).  Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."  *Anderson v. Home Depot U.S.A., Inc.*, No. 2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*."  *Id.* at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. 08-CV-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d

at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

### B. InterMoor's Motion to Exclude the Testimony of Michael Frampton

US Wind retained Michael Frampton to support its claim that InterMoor breached its duty to perform its work "in a good and workmanlike manner" and to report on the "roles and responsibilities of an installation contractor on an offshore installation project similar to the US Wind Met Mast Installation Project" and provide his opinion on "whether InterMoor adequately performed the roles and responsibilities of an installation contractor on the Project, including due diligence to confirm that the lift boat *Great White* was suitable to perform the Project in August / September of 2019." ECF 168-5 at 2.

Mr. Frampton began his career in the offshore wind industry in 2000 and has worked on more than 30 offshore wind projects across the world, including in the United States.  ECF 171 at 1, 3.  He has primarily served as a Marine Warranty Surveyor, overseeing and approving the work of contractors installing offshore structures, such as meteorological masts of the foundations of a windfarm.  *Id.* at 4.  He served as a Marine Warranty Surveyor on the first offshore windfarm project in the United States, personally working with the installation contractor on the project.  ECF 171-2 at 8, 31.  Beyond his work experience, Mr. Frampton co-authored the "Guidelines for the Selection and Operation of Jack-ups in the Marine Renewable Energy Industry" ("RenewableUK Guidelines"), a peer-reviewed publication that provides "industry guidance aimed at jack-up owners, operators, developers and contractors engaged in site-investigation, construction, operation and maintenance of offshore wind and marine energy installations."  ECF 171 at 4–5; ECF 171-4 at 4.

InterMoor first attempts to strike Mr. Frampton as an expert because it argues he is unqualified to provide an opinion on the roles and responsibilities of an installation contractor *in the United States*.  ECF 168-1 at 6.  For evidence of this, InterMoor points to the fact that Mr. Frampton relies on the RenewableUK Guidelines, which are based on U.K. law, and Mr. Frampton concedes that he was unaware of any law or regulation in the United States governing offshore windfarm installation.  *Id.* at 7.

First, Mr. Frampton does not solely rely on the RenewableUK Guidelines as the basis of his testimony.  In his report, Mr. Frampton explains that his opinions "are based on [his] education and experiences as a Naval Architect, Captain, and a Marine Warranty Surveyor."  ECF 168-5 at 4.  In his report and deposition, he explicitly acknowledges that the RenewableUK Guidelines

are not directly applicable in the United States, but refers to the guidelines "as an example of industry standards." *Id.* at 5.

Further, there is evidence that the RenewableUK Guidelines *have* been used to install one of the only two operational offshore windfarms in the United States. Mr. Frampton testified that he provided the marine warranty services and the site-specific location approval for the Block Island Wind Farm project—the first offshore windfarm in the United States. ECF 171-2 at 8. Mr. Frampton further testified that while working on the Block Island Wind Farm project, the installation contractor of the project could not find any U.S. guidance for installing the windfarm, and so it relied on the RenewableUK Guidelines drafted by Mr. Frampton to oversee and complete the installation. *Id.* at 31. Thus, Mr. Frampton's guidelines were referenced to successfully install the first offshore windfarm project (and one of only two operational offshore windfarm projects) in this country.

InterMoor does not challenge the fact that the RenewableUK Guidelines are peer-reviewed and represent good industry practice in the United Kingdom. Thus, Mr. Frampton's testimony, and the RenewableUK Guidelines to which he refers, are sufficiently reliable to meet the *Daubert* standard, although certainly subject to cross-examination on the domestic applicability of those guidelines.

For a proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Mr. Frampton's experience in the offshore windfarm industry as a Marine Warranty Surveyor, including in the United States, and his experience in drafting best practices for the world's offshore wind energy markets will certainly assist a factfinder in understanding what is expected generally of an installation contractor in the industry—a disputed

factual question in this case.  To the extent his knowledge is based on foreign projects and practices, this distinction cuts to the weight of Mr. Frampton's testimony, not its admissibility.  *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[U]nfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility."); *see also Holderbaum v. Carnival Corp.*, No. 13-CV-24216, 2015 WL 5006071, at *7 (S.D. Fla. Aug. 23, 2015) ("To be sure, those standards may be accorded less weight than some other set of guidelines or regulations that are generally applicable, but that is an issue to be weighed by the trier-of-fact, not conclusively determined as excludable by the Court based on a *Daubert* motion.").  Mr. Frampton's testimony is relevant to the case at hand.

InterMoor next attempts to exclude Mr. Frampton's testimony because it is "mere *ipse dixit* of the expert."  ECF 168-1 at 8.  In other words, InterMoor argues that Mr. Frampton's opinions are mere "belief or speculation," and not grounded by accepted scientific or other valid methods.  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)).  InterMoor points to assertions by Mr. Frampton where he was unable to identify any U.S. regulation or law to support his belief.  ECF 168-1 at 8.

As explained above, Mr. Frampton's testimony speaks to general industry practice, which is relevant for deciding what amounts to "workmanlike" installation of the meteorological mast.  Further, his opinions are based on his experience and education in the industry, including his experience working on offshore windfarm projects in the United States, as well as his own peer-reviewed publication on the topic.  These sources provide adequate and reliable grounds for his expert opinions, which do not amount to mere speculation.  Industry standards are relevant because the parties' Agreement defines "workmanlike manner" as "a manner deemed proficient by those

with the special knowledge, training, and experience to judge such services" and does not restrict this standard to only U.S. laws and regulations. *See* ECF 171-5 at 8; *cf. Hanna Yachts, LLC v. Caribbean Breeze Marine A.C.*, X, LLC, No. 12-CV-62220, 2013 WL 12141336, at *2 (S.D. Fla. Mar. 19, 2013) ("Breach of the implied warranty of workmanlike performance will not be found if the contractor or repairperson performed the work in accordance with industry standards."). Mr. Frampton is not required to cite U.S. regulations or laws for his testimony to be relevant to understanding what constitutes a "workmanlike manner."  *See, e.g.*, *Page v. Supervalu, Inc.*, No. 14-CV-1508, 2015 WL 1439572, at *14 (D. Md. Mar. 26, 2015) (noting that "an expert witness may opine about a party's liability based upon industry custom and practice," *id.*, and finding the expert's testimony relevant even though he relied on industry standards rather than "controlling law," *id.* at *13).  And in this case, with a dearth of relevant U.S. regulations or laws in the area, Mr. Frampton is not ignoring or contravening U.S. standards, but simply extrapolating standards from practices in countries with more experience.

For these reasons, the Court finds that Mr. Frampton's testimony is both relevant and reliable, and not "mere *ipse dixit*," and denies InterMoor's Motion to Exclude the Testimony of Michael Frampton.

### C.  US Wind's Motion in Limine to Exclude the Opinions of Scott C. McClure Regarding the Offshore Wind Industry

To counter Mr. Frampton's opinion regarding the expected duties of InterMoor under the Agreement, InterMoor retained its own expert, Scott C. McClure.  ECF 187 at 8.  Mr. McClure received his civil engineering degree with an ocean engineering specialty, and he has spent over 40 years working in the offshore and marine transportation industry.  *Id.* at 5–6; ECF 187-7 at 3. He estimates that he has worked on between 1,500 to 2,500 offshore installation projects over the

course of his career, which have required him to review and analyze sea conditions to determine whether and when offshore lifts of vessels could occur.  ECF 187 at 7–8.

US Wind seeks to exclude Mr. McClure's opinions to the extent they relate to the offshore wind industry because Mr. McClure's experience is primarily in other industries, such as oil and gas, and not the offshore wind industry.  ECF 173-1 at 4.  US Wind argues that "Mr. McClure's opinions are rooted in hearsay" and based on a narrow field of experience in the offshore wind industry.  *Id.* at 7.

The record suggests otherwise.  Mr. McClure's opinions are based on his long career in the transportation and installation of offshore objects, regardless of the end use of such objects.  He explained how this work experience has made him "familiar with how tasks are allocated amongst various contractors in an offshore construction project," and provided the basis of his opinions in this case.  ECF 187-7 at 3.

Although it is true that much of Mr. McClure's background is not in the offshore wind industry, his skills are transferrable and would "help the trier of fact to understand the evidence to determine a fact in issue."  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021).  As noted above, the U.S. offshore wind industry is relatively new and there is little expertise to be derived from U.S. offshore wind projects.  Accordingly, much of the relevant experience comes from projects in other countries, as in the case of US Wind's expert, or projects in related offshore industries, like Mr. McClure offers.  Mr. McClure's testimony and written affidavit explain that the knowledge of offshore oil and gas installations is directly transferrable to offshore wind installations.  ECF 187 at 7 ("[Oil and gas installation services] are no different from any offshore project, so it doesn't matter what the end use was.").

The critical issues in this case revolve around whether InterMoor had a duty to investigate the expected weather conditions and evaluate the *Great White*'s operating limits, and if so, whether InterMoor appropriately executed these analyses. These issues would be equally relevant in any offshore installation project that requires a lift boat. ECF 187-7 at 3 ("The technical issues typically encountered in offshore oil and gas work are directly applicable to offshore wind."); *see also* US Wind's Site Assessment Plan, ECF 187-1 at 2–8 (describing the installation of the meteorological mast). This project, unfortunately, never got to the point of installing the meteorological mast or any windfarm-specific material. Thus, the problems arose at the initial planning and mobilization phase of the project. If the dispute revolved around whether InterMoor had appropriate attached the blades of the wind turbine, an offshore oil and gas installation expert would be inapposite. But the question is essentially whether InterMoor needed to check the weather forecast before sending the lift boat off on its voyage—a question applicable to any offshore installation project, including the many projects worked on by Mr. McClure. As Mr. McClure testified, the transportation services for a meteorological mast "are no different from any offshore construction project," so the necessary preparations for transportation and installation are the same regardless of the end use of the transported goods. ECF 173-6 at 13. This makes Mr. McClure's experience and testimony directly relevant.

In its reply, US Wind attempts to narrow the scope of its motion to just the opinions of Mr. McClure regarding the offshore wind industry. ECF 173. But as explained above, there is evidence that the knowledge from related fields is directly applicable to the offshore wind industry, particularly on the factual issues disputed in this case. Thus, Mr. McClure's lack of experience in the offshore wind energy may affect the weight of his testimony, but does not detract from his experience and credibility as an expert on the relevant offshore installation issues.

For these reasons, US Wind's motion in limine to exclude the opinions of Scott C. McClure regarding the offshore wind industry is denied.

## V.   PARTIAL MOTION FOR SUMMARY JUDGMENT

The Court now turns to InterMoor's motion for summary judgment.[3]  As described above, US Wind's claims against InterMoor center around two primary incidents – InterMoor's failure to install the meteorological mast and InterMoor's failure to turn over the meteorological mast to US Wind after the project failed.    Each claim is addressed in turn below.

### A.  Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material fact.  *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson*

---

[3] InterMoor titles its filing "Partial Motion for Summary Judgment," but also states it seeks judgment "on all causes of action asserted against it" by US Wind.  ECF 166 at 1.  This Court need not resolve that incongruity since summary judgment will be denied in part.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B.  Breach of the Agreement's Terms and Warranties**

Count I of the Second Amended Complaint ("SAC") alleges breach of contract and Count II alleges breach of warranty.  While Count II specifically refers to the warranty in Section 9.1 of the parties' Agreement, Count I describes various alleged duties and obligations without referencing the contractual provisions from which they derive.  In its opposition to the motion for

summary judgment, however, US Wind refers to six provisions (7.1, 8.1, 8.2, 8.6, 10, 15), in addition to Section 9.1.[4]  Each of those provisions is therefore addressed in the analysis below.

### i.    Section 7.1

Section 7.1 of the Agreement reads: "Contractor certifies that it is and shall conduct itself as an independent contractor in the performance of the Work.  Contractor shall retain and exercise the authority and right to direct and control the manner in which all Work for Client is performed[.]"   US Wind suggests that this provision, when read in conjunction with other provisions in the Agreement, imposed a duty to control its subcontractors in a reasonable manner to ensure the work would be properly performed.  This Court disagrees.  Section 7.1 simply clarifies that InterMoor would be working as an independent contractor and therefore would control the manner in which it worked, as opposed to if it were an employee, agent, or subcontractor to US Wind.  Nothing in those principles establishes any duty to supervise its own subcontractors in any particular manner.

InterMoor's partial motion for summary judgment will be granted as to its claim in Count I relating to Section 7.1 of the Agreement.

### ii.    Section 8.1

Section 8.1 of the Agreement reads:

> Contractor shall furnish, at its own expense, the machinery, equipment, tools, spare parts, transportation, supplies, and any other items specified in the Work Order to be used in the performance and timely completion of the Work.  All items furnished by Contractor

---

[4] InterMoor repeatedly argues that US Wind should be precluded from advancing its arguments because it did not reference those contractual provisions in the SAC.  While it would of course be best practice to specify the contractual provisions in the complaint, there is no legal requirement that a plaintiff do so.  And the claims currently advanced by US Wind align with those set forth in the SAC.

> to be incorporated into the Work shall be suitable for the Work and
> new, unless otherwise specified.

US Wind asserts that InterMoor failed to provide suitable equipment in violation of Section 8.1 by using the lift boat's outdated operations manual, ECF 75-2 ¶ 85, and by using a lift boat with operating limits incompatible with the expected weather conditions, *id.* ¶ 91. InterMoor argues that the language "at its own expense" shows that this provision only applies to equipment provided by InterMoor itself, not its subcontractors. ECF 166-1 at 20. InterMoor asserts that the provision was only intended to establish who bore the cost of the equipment, and that it was not a guarantee about the suitability of the equipment used by All Coast. ECF 188 at 5–6. In response, US Wind references Section 15, which underscores that InterMoor is responsible for its subcontractors and their performance, and Section 3, which defines "Contractor Group" as InterMoor as well as its subcontractors. ECF 174 at 11.

"'A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous.' 'Contract terms are to be given their ordinary meaning, and whenever possible, the plain language of the contract should be considered first.' Only if the language is ambiguous should a court examine extrinsic evidence and look beyond the written language of the contract." *Tug Blarney, LLC v. Ridge Contracting, Inc.*, 14 F. Supp. 3d 1255, 1263 (D. Alaska 2014) (internal citations omitted).

It would be an artificially narrow reading of Section 8.1 to exempt all equipment and items provided by InterMoor's subcontractors. It would also create a liability loophole, permitting InterMoor to transfer responsibility for the suitability of the equipment used in the project merely by delegating all tasks to a subcontractor. Such an interpretation would expressly contradict Section 15, which keeps the obligation to complete the work on InterMoor, even when it hires

subcontractors to assist.  Further, Section 8.1 requires that InterMoor "shall furnish" suitable equipment to perform the work.  A dictionary definition and plain understanding of "furnish" is "to provide with what is needed."  *Furnish*, MERRIAM-WEBSTER.COM (2022).  InterMoor is furnishing the necessary equipment for the project, even when it procures such equipment through third parties.  Thus, the fact that All Coast provided the vessel and operations manual does not on its own relieve InterMoor of liability.

The Agreement only makes guarantees regarding the equipment "to be used in the performance and timely completion of the Work."  Thus, if InterMoor's scope of work was to merely hire the *Great White*, InterMoor provided the necessary equipment, *i.e.*, the contract and staff to formally charter the vessel.  But, if InterMoor, as an installation contractor, was expected to furnish all the appropriate equipment to install the meteorological mast, arguments could be made that InterMoor failed its promised responsibilities.  Thus, the success of US Wind's claim boils down to an understanding of InterMoor's scope of work.

Unfortunately, the Agreement itself merely refers to a "Work Order" agreed to by the parties in Section 5, and does not specifically enumerate InterMoor's responsibilities.  And there is no formal "Work Order," presumably because of the rushed nature of the Agreement's drafting and signing.  Rather, there is a "Scope of Work" document, sent by email between the parties prior to signing the Agreement.  ECF 174-4.  Assuming this document constitutes the "Work Order" envisioned in the Agreement, it nonetheless provides little clarity about the breadth or details of the work InterMoor would perform.  At most, it states that InterMoor "will provide Company with a single source solution for the services described herein," and then describes services like "[p]articipate in jointly-led Installation Engineering / Construction Discussions and actions."  This vague language provides no greater understanding of InterMoor's duties.  Thus, the scope of

InterMoor's responsibilities under the Agreement, and whether InterMoor failed to provide suitable equipment to execute those responsibilities, remain open questions of fact.

### iii.    Section 8.2

Section 8.2 of the Agreement reads:

> Contractor shall furnish, at its own expense, the personnel, labor, expertise, and supervision (skilled in their trades and trained in safety) to perform and timely complete the Work as described in, and in accordance with, the applicable Work Order.

US Wind argues that InterMoor failed to provide the appropriate expertise and labor to complete the project when it failed to check the compatibility of the *Great White*'s operational limits against the expected weather conditions of the project site prior to the vessel's departure. ECF 75-2 ¶¶ 67, 94, 88.  Once again, InterMoor argues that the "at its own expense" language limits the provision's applicability to just InterMoor's services and personnel – not those provided by All Coast.  ECF 166-1 at 20.

For the same reasons provided above, the actions or inactions of All Coast do not absolve InterMoor of its responsibilities under the Agreement.  And again, a factual question remains as to what those responsibilities entailed.  For example, whether review of the lift boat's operations manual and comparison with expected weather conditions is part of the "expertise" of mobilizing the boat to the site is a question of fact.

### iv.    Section 8.6

Section 8.6 of the Agreement reads: "Contractor acknowledges it is generally familiar with, and understands, the nature of the Work, the environment, and the difficulties that may be incident to performing the Work[.]"  In its SAC, US Wind argues that InterMoor was inexperienced in offshore installation operations in the Atlantic Coast of the United States, ECF 75-2 ¶ 78.  It points to InterMoor's alleged failure to compare weather conditions with the vessel's operation manual,

*id.* ¶ 67, 69, until after the lift boat had arrived on site, *id.* ¶ 70, 72, as evidence of this inexperience, ECF 174 at 13–14.  US Wind also presents evidence from a corporate deposition that InterMoor was unaware that site weather was publicly available in that region.  ECF 174 at 13.  InterMoor responds by noting that the Agreement's provision refers to InterMoor's knowledge *at the time of signing*, and argues that all of US Wind's examples occurred after the Agreement was signed.  ECF 188 at 7.

InterMoor is correct about the temporal limitations of the Agreement's provision—Section 8.6 uses present-tense language and only asserts that InterMoor is "generally familiar with, and understands, the nature of the Work, the environment, and the difficulties that may be incident to performing the Work" at the time of the Agreement's signing.  However, although most of US Wind's allegations relate to post-signing actions, such actions may reveal a general unfamiliarity that existed at the time the parties signed the Agreement.  The fact that InterMoor did not inquire about the weather window or review the operations manual prior to departure could be a result of InterMoor's inexperience in the northeast Atlantic coastline region.  To be sure, "general familiarity" is an amorphous standard and a low bar—it does not explicitly require expertise or even prior experience in the region.  However, US Wind has put forward at least some evidence to suggest InterMoor's lack of such familiarity with the environment and associated challenges of installing a meteorological mast off the coastline of Maryland.  This therefore remains an open question of fact.

### v.   Section 9.1 (Count II)

Section 9.1 of the Agreement, which provides a warranty to the services, reads:

> Contractor warrants that any and all services or Work performed by Contractor Group shall be performed in a good and workmanlike manner and in compliance with Client's requirements and specifications, if any, applicable to said Work.  'Workmanlike

> manner' means services performed in a manner deemed proficient
> by those with the special knowledge, training, and experience to
> judge such services.   Contractor further warrants that all of the
> members of Contractor Group will be properly and adequately
> trained to perform the Work competently and safely.

In its SAC, US Wind alleges that InterMoor failed to perform its responsibilities as an installation contractor in a "workmanlike manner" because it failed to review the suitability of the *Great White* prior to the vessel's departure.  ECF 75-2 ¶¶ 88; 129.  InterMoor first argues that the failure to review the suitability of the vessel was not within its scope of work.  ECF 166-1 at 22. For evidence of this, InterMoor points to the deposition of Graham Tyson, a representative of US Wind, who testified that US Wind asked ContrEx (a different contractor) to prepare a historical weather analysis and compare it to the lifting limits of the *Great White*.  *Id.* at 22–23.  In opposition, US Wind provides evidence from Scott McClure, InterMoor's expert witness, who testified that it was his "understanding that under this scope of work, InterMoor had an obligation to review and agree to installation plans and engineering."  ECF 174 at 16.  US Wind also presents testimony of its own expert witness, Michael Frampton, who reports that review of the suitability of the vessel is an expected component of an installation contractor, such as InterMoor.  *Id.* at 16–17; ECF 168-5 at 3.

As explained above, the precise scope of work is a question of fact not appropriate for this stage of litigation.  The parties' Agreement does not outline specific tasks, and the "Scope of Work" document emailed between the parties includes unilluminating, vague descriptions of the parties' respective roles in the project.  Both InterMoor and US Wind have presented evidence to

support their view of InterMoor's responsibilities, and so, this question of fact is left for resolution at trial.[5]

In the alternative, InterMoor argues that even if a suitability review fell within its responsibilities, US Wind waived any such requirement. For evidence of this, InterMoor presents the testimony of Joao Ruiz, InterMoor's project manager, who testified that he asked US Wind during a meeting whether it required InterMoor to perform a suitability analysis of the *Great White* and was "told no." ECF 166-1 at 23. In opposition, US Wind takes a different view of Mr. Ruiz's testimony, noting that he could not identify any specific communication from US Wind that requested InterMoor to not complete the review. ECF 174 at 19. Further, US Wind provides testimony from Mr. Vitale, who suggests that US Wind entrusted the work primarily to InterMoor and ultimately valued InterMoor's analysis over that of other contractors. *Id.*

"Waiver of conditions is expressly provided for by Texas cases." *See* 49 TEX. PRAC., CONTRACT LAW § 7.9. A party may waive a condition in writing or through its conduct, but either way, "[w]hether a party's conduct constitutes a waiver is generally a question of fact." *Id.* (citing *Bekins Moving & Storage*, 947 S.W.2d 568, 576 (Tex. App. 1997); *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex. Civ. App. 1981)). Both InterMoor and US Wind have presented evidence regarding whether US Wind waived InterMoor's responsibility to conduct the suitability review of the *Great White*. Ultimately, the dispute invokes the credibility of both parties' witnesses and is a question of fact not appropriate for disposition at this stage of litigation.

InterMoor's partial motion for summary judgment as to Count Two is therefore denied.

---

[5] This Court notes generally that the parties' poorly drafted Agreement and Scope of Work may make it difficult for the party with the burden of proof to prevail on its claims.

vi.     **Section 10**

Section 10 of the Agreement reads:

> Client may order additions, deletions, or make changes, to the scope
> of Work, provided such additions or changes are reasonably related
> to the original scope of Work.  No extra work or change shall be
> performed unless a written authorization has been issued by Client,
> or a separate written estimate has been submitted by Contractor to
> Client and agreed to in writing by Client.  This authorization or
> estimate shall state the extension of time, if any, allowed and
> specifically provide for the cost for this addition or change to the
> Work . . . .

US Wind argues that InterMoor breached this provision when InterMoor failed to comply

with its demand that the meteorological mast be returned to US Wind in Baltimore once it had

called off the project.  ECF 75-2 ¶¶ 98–99.  InterMoor counters that US Wind cannot recover under

Section 10 because US Wind did not comply with the condition precedent, *i.e.*, the requirement

that the authorization for the extra work state the extension of time and provide for the additional

cost for the change of work.  ECF 188 at 9.

"A condition precedent is an event that must happen or be performed before a right can

accrue to enforce an obligation."  *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992);

*Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).  A party seeking

to recover under a contract bears the burden of proving that all conditions precedent have been

satisfied.  *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

"Where the occurrence of a condition is required to trigger a party's duties, the effect of the

nonoccurrence of the condition will be to excuse that party's duty to perform.  There are, however,

several important nuances in Texas law.  Most importantly, if the condition is deemed immaterial

or if excusing the party's performance would be disproportionate, then the nonoccurrence of the

condition will not operate as an excuse."  *See* 49 TEX. PRAC., CONTRACT LAW § 7.11.

InterMoor argues that the condition precedent in this case was not satisfied, and thus it was entitled to disregard US Wind's request.  US Wind, however, has adduced evidence sufficient to create a genuine issue of material fact on this point.  On September 26th, US Wind's Country Manager, Salvo Vitale, emailed InterMoor directing it to no longer install the meteorological mast given the deteriorating weather conditions and asked InterMoor "to contact Mark Rice ASAP, here copied, for the purpose of unloading the Met Tower at MAPC's facilities in Baltimore."  ECF 174-16 at 2.  InterMoor responded that they would "begin winding up the work," would calculate and prepare for submission the demobilization costs, and reminded US Wind that it had two outstanding invoices due the following day.  *Id.*  Shortly thereafter, Carrie Adams, the Commercial Manager of InterMoor who was aware of Mr. Vitale's email, discussed the situation with a representative from All Coast and requested information about the costs of demobilization.  ECF 174-21.  Meanwhile, US Wind began outreach to the subcontractors directly to inquire about costs of bringing the meteorological mast to Baltimore.  ECF 174-22 at 2.

By October 3rd, US Wind had yet to hear from InterMoor regarding the rerouting request. Mr. Vitale followed up with InterMoor, including the subcontractors on the email, reiterating US Wind's request to unload the equipment at Baltimore.  ECF 174-26 at 3.  The email provided specific instructions and "directed [InterMoor] to take contact with Mark Rice and Mike Urrea []️ to arrange the operational details."  *Id.* at 4.  Mr. Vitale further explained that "US Wind Inc. is available to pay directly the relevant subcontractors (All Coast and McDonough Marine) for this specific Work Order."  *Id.*  The following day, Ms. Adams suggested setting up a call, to which Mr. Salvo agreed, and he once again reiterated that US Wind was willing to pay for the delivery, or willing to retrieve the items from InterMoor in the Delaware Bay.  *Id.* at 2.  Later that same day, Ms. Adams informed McDonough that "[t]he tug and barge are continuing the return to LA.

InterMoor is paying McDonough and US Wind has not paid their invoices for several weeks now. The contract between InterMoor and McDonough remains intact." ECF 174-25 at 2. Indeed, the meteorological mast continued its return journey and InterMoor did not follow US Wind's request to unload the mast in the Northeast.

From these facts, US Wind has provided evidence of a written authorization, namely, Mr. Vitale's emails instructing InterMoor to unload the mast in Baltimore. The plain terms of the Agreement require that such an authorization must include the "extension of time, *if any*." (Emphasis added). Here, the project's timeline had been significantly cut short, so no extension of time was necessary. The lack of a stated time extension therefore does not excuse InterMoor's failure to perform. The plain terms also require that such an authorization "specifically provide for the cost for this addition or change to the Work[.]" The emails from Mr. Vitale clearly expressed that US Wind would be willing to cover the cost of unloading the meteorological mast. Therefore, there is evidence that US Wind may have satisfied the conditions precedent of the change in work provision of the Agreement, and summary judgment is not warranted.

InterMoor's partial motion for summary judgment under Section 10 of the Agreement is denied.

### vii. Summary

In summary, this Court denies InterMoor's partial motion for summary judgment for US Wind's breach of contract and warranty claims based on Sections 8.1, 8.2, 8.6, 9.1 and 10 of the Agreement, but grants the partial motion for summary judgment as to the claims in Count I based

on Section 7.1 of the Agreement.[6]   The remainder of Count I, and the claim in Count II, will proceed to trial.

### C. Recission of the Agreement (Count III)

In its SAC, US Wind argues for rescission of the Agreement due to InterMoor's allegedly negligent misrepresentations, ECF 75-2 ¶ 140–42, and its material breaches of the Agreement, *id.* ¶¶ 148–49.  US Wind seeks to rescind the Agreement to recover the $3.3 million it has paid to InterMoor, asserting that it "did not receive any benefit of the bargain." *Id.* ¶ 154.

As noted at the outset, the parties' choice of law provision dictates the applicable law.  As there is no general maritime law regarding rescission of contracts, this Court looks to the laws of Texas.  The parties disagree about whether Texas law permits rescission in this case.  InterMoor argues that rescission is precluded when there is an adequate remedy at law, such as monetary damages.  ECF 166-1 at 26.  In contrast, US Wind argues that Texas law recognizes rescission as an equitable remedy still available when damages are sought.  ECF 174 at 21–22.

As explained by the Supreme Court of Texas, "Rescission is merely the 'common, shorthand name' for the composite remedy of rescission and restitution." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 54 cmt. a (2011)).  "Rescission is a form of restitution

---

[6] In its opposition, US Wind notes that it relies on "the entire [Agreement], and not just on the specific sections selected by InterMoor."  ECF 174 at 14.  US Wind cites ¶¶ 57, 58, 59, 78, 85, 88, 90–93, 97–99, and 107–126 from its Complaint.  *Id.*  However, of these cited paragraphs, only ¶¶ 57–59 and 107–126 have not been discussed above.  *See* Pl.'s Second Am. Compl., ECF 93.  Paragraphs 57 through 59 simply restate terms of the Agreement (terms already reviewed in this opinion) without alleging any breach of these provisions.  *Id.*  Paragraphs 107 through 110 restate the alleged breaches already discussed above, and paragraphs 111 through 118 simply state facts related to the termination of the Agreement, without alleging any additional basis for a breach of contract claim.  *Id.*  Thus, this Court has reviewed all provisions of the Agreement that US Wind relies on to support its breach of contract claim.

that applies if the transaction may still be unwound; if it cannot, a plaintiff may sue for damages."
*Id.* (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 cmt. a)).  Thus,
"'rescission is one of the principal asset-based remedies in restitution,' and it 'restore[s] the parties
to the status quo ante by unwinding the contractual exchange instead of pressing it forward.'" *Id.*

"Rescission is an equitable remedy that operates to extinguish a contract that is legally
valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust
enrichment." *Martin v. Cadle Company*, 133 S.W.3d 897, 903 (Tex. App. – Dallas 2004, pet.
denied).  As with other equitable remedies, "[t]he decision whether to grant rescission lies within
the trial court's sound discretion."  *Humphrey v. Camelot Ret. Cmty.*, 893 S.W.2d 55, 59 (Tex.
App. 1994).  The party seeking rescission bears the burden to establish he is entitled to such
equitable relief.  *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 836 (Tex. App. – Dallas
1984, writ refused n.r.e).

As an equitable remedy, rescission generally will not be granted if there is a fully adequate
remedy at law.  *See, e.g.*, *Scott v. Sebree*, 986 S.W.2d 364, 368 (Tex. App. – Austin 1999, pet.
denied); *Ennis v. Interstate Distributors, Inc.*, 598 S.W.2d 903, 906–07 (Tex. Civ. App. – Dallas
1980, no writ); *Hausler v. Harding-Gill Co.*, 15 S.W.2d 548, 549 (Tex. Comm'n App. 1929); *see
also* 49 TEX. PRAC., Contract Law § 10.40.  However, if damages are essential to attaining full
justice, they may be granted in addition to rescission.  *See, e.g.*, *Ennis*, 598 S.W.2d at 907–08; *see
also Boyter v. MCR Const. Co.*, 673 S.W.2d 938 (Tex. App. – Dallas 1984, writ ref'd n.r.e.); 49
TEX. PRAC., Contract Law § 10.40.  Thus, Texas law permits a plaintiff to recover both damages
and rescission, albeit in narrow instances.

US Wind has not alleged such an instance.  US Wind seeks to rescind the Agreement under
a theory of breach of contract or negligent misrepresentation.  But rescission is not available for

"a mere breach of contract," *Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 612 (N.D. Tex. 2006) (citing *Freyer v. Michels*, 360 S.W.2d 559, 561 (Tex. App. – Dallas 1962, writ dism'd)), and to the extent that US Wind could argue rescission for a breach of contract, US Wind has not presented evidence or argument to suggest that monetary damages obtained through its breach of contract claim would be insufficient to remedy its harm.

Further, "[c]ourts applying Texas law, . . . have concluded that 'rescission is not an available remedy' for negligent misrepresentation claims." *Roberts v. Fed. Home Loan Corp.*, No. 11-CV-3304, 2013 WL 1345222, at *6 (S.D. Tex. Mar. 30, 2013) (quoting *Arisma Group, LLC v. Trout & Zimmer, Inc.*, 2009 WL 3075203, at *4 (N.D. Tex. Sept. 25, 2009)).  US Wind seeks to recover its $3.3 million already paid because it "did not receive any benefit of the bargain."  ECF 75-2 ¶ 154.  But the Texas Supreme Court has held that the "benefit of the bargain measure of damages is not available for a claim of negligent misrepresentation." *D. S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex.1998).  "The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for pecuniary loss to him . . . ." *Id.* (citing Restatement (Second) of Torts § 552B (1977).  In other words, US Wind would be entitled to only monetary damages, not rescission, for its negligent misrepresentation claim.

InterMoor's partial motion for summary judgment as to Count III is granted.

### D.  Unjust Enrichment (Count IV)

In the alternative, US Wind argues that InterMoor wrongly received payments "far in excess of the reasonable commercial value" for "deficient" services.  ECF 75-2 ¶¶ 159–60.  In fact, US Wind asserts that it received no commercial value from InterMoor's services.  *Id.* ¶ 162. The parties disagree about whether US Wind may bring an unjust enrichment claim when the parties have executed a written agreement.

It is well-settled that "[t]he unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties." *Burlington N. R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App. 1996), writ granted (June 12, 1997), aff'd sub nom. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998). US Wind concedes that the parties' Agreement governs InterMoor's scope of work and its control and authority over its subcontractors. ECF 174 at 24. However, US Wind argues that the scope of this Agreement is in dispute, allowing its unjust enrichment claim to fill the gap between the written agreement and the parties' non-contractual conduct. *Id.* This circular logic is unavailing. The Agreement governs the scope of the respective parties' work and the agreed expectations between them. Indeed, the Agreement itself "supersedes all prior oral or written proposals, communications, or other agreements related to the subject matter of th[e] Agreement." US Wind's allegation—that InterMoor did not adequately perform its contractually obligated duties—is "related to the subject matter of this Agreement." Thus, any actions falling outside of the Agreement would also fall outside of InterMoor's duties to US Wind, undermining US Wind's theory of unjust enrichment.

InterMoor's partial motion for summary judgment is granted as to Count IV.

### E. Tortious Interference with Prospective Contractual Relations (Count V)

As described above, in late September of 2019, it became clear that the *Great White* was not going to be able to operate in the forecasted weather conditions, and US Wind terminated the attempt to install the meteorological mast. ECF 174-16 at 2–3. The parties ended the Agreement, but disputed whether it was an optional or default termination. *Id.*; ECF 174-20. Regardless, on September 26th, US Wind directed InterMoor to bring the meteorological tower to Baltimore, Maryland, ECF 174-16 at 2–3, mostly likely because doing so would at least keep the tower close

to its final destination.    InterMoor began outreach to its subcontractors to inquire about demobilization costs, and in an email to All Coast, directed the subcontractor to "[a]ssume we will be holding their tower hostage until they pay up."  ECF 174-21 at 3.

On September 28th, US Wind began reaching out to InterMoor's subcontractors directly to determine whether dropping the mast off in Baltimore would be possible, including contacting McDonough Barge Services ("McDonough").  ECF 174-22 at 2; ECF 75-2 ¶ 168.  InterMoor followed up with McDonough, requesting that any requests from US Wind be forwarded straight to them.  ECF 174-22 at 3 ("Per our conversation, would you please forward any emails received from US Wind to me?  We will deal with any request or information required from them.").  Thereafter, McDonough informed US Wind that it would need to contact InterMoor and did not conduct business with US Wind.  ECF 75-2 ¶ 170; ECF 174-28 at 2 ("We refer US Wind to InterMoor . . . ."); ECF 174-29.

On October 2nd, counsel for US Wind sent a letter to McDonough, demanding the return of its meteorological mast and that, to the extent it refused to return the property, to keep the mast in Delaware waters.  ECF 174-23 at 4.  As requested, McDonough forwarded this letter to InterMoor and arranged to speak with InterMoor about the letter from US Wind.  *Id.* at 2.

On the following day, having heard no response from InterMoor regarding the original request to keep the mast in Baltimore, ECF 75-2 ¶ 167, US Wind followed up with InterMoor and the subcontractors, again reiterating its request to unload the equipment.  ECF 174-26 at 3.  US Wind and InterMoor arranged a phone call to discuss the matter.  *Id.* at 2–3.

On October 4th, InterMoor informed McDonough via email: "The tug and barge are continuing the return to LA.  InterMoor is paying McDonough and US Wind has not paid their invoices for several weeks now.  The contract between InterMoor and McDonough remains

intact." ECF 174-25 at 2. The mast therefore continued its journey south. Following litigation in various U.S. District Courts and an arrest of the barge, US Wind ultimately regained possession of its mast. ECF 174 at 26.

US Wind claims that InterMoor's willful actions, namely its refusal to return the mast and its direction to its subcontractors not to work with US Wind, interfered with US Wind's ability to contract and resulted in unnecessary project costs and litigation expenses. ECF 75-2 ¶ 174. InterMoor argues that US Wind cannot prove that InterMoor acted with a deliberate intent to harm US Wind's business relationships, ECF 166-1 at 32, nor that any such business relationships were likely to occur, *id.* at 36.

The parties cite Maryland law in support of their respective arguments. US Wind's tortious interference claim falls outside the subject matter of the parties' Agreement, given that the parties sought to end the Agreement by the time the alleged tortious interference occurred, and because the dispute involves third-party arrangements not contemplated by the Agreement. Thus, this Court will analyze InterMoor's motion and US Wind's claim under Maryland law.

Maryland law has recognized claims based on "malicious or wrongful interference with economic relationships" for over one hundred years, and the elements have remained unchanged. *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 652 (1994). To prove the tort, a plaintiff must show:

> (1) intentional and wilful [sic] acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Id.* (quoting *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909)) (internal quotation marks omitted). "A successful plaintiff in a tortious interference case is not limited to the contract measure of damages, the benefit of the bargain, . . . but can recover 'the more extensive tort

damages.' . . . Those damages 'include the pecuniary loss of the benefits of the contract, consequential losses for which the tortious act is the legal cause, emotional distress and actual harm to reputation [] and, in appropriate circumstances, punitive damages." *Id.* at 654–55 (internal citations omitted).

To succeed on its claim, US Wind must show that InterMoor "interfere[d] through improper or wrongful means." *Id.* at 656. "Wrongful or unlawful acts include common law torts and 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Id.* at 657 (internal citations omitted). On this point, InterMoor argues that it did nothing illegal or wrong, and thus, that US Wind's claim must fail. ECF 166-1 at 32. However, the list of wrongful conduct includes malicious conduct. "In addition, 'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference." *Alexander & Alexander Inc.*, 336 Md. at 657.

"Courts and commentators have often found it difficult to determine when purposeful interference with business relationships, behavior that is an integral part of commercial competition, should be considered 'wrongful' so as to give rise to a cause of action in tort." *Alexander & Alexander Inc.*, 336 Md. at 653. Nonetheless, US Wind has adduced evidence to suggest improper conduct. For one, it points to the email from US Wind describing its intent to hold the mast "hostage," even after US Wind requested the mast to be unloaded in Baltimore. Further, InterMoor failed to respond to US Wind's requests, instructed its subcontractors to forward all inquiries from US Wind to InterMoor, and directed all ships to stay course, in contradiction of US Wind's express request.

InterMoor responds that it had a legal right to seize US Wind's property. ECF 188 at 16. Even if this were true, the act of holding the mast hostage arguably demonstrates "malicious intent," especially when combined with a decision to cut off communications with US Wind and the act of discouraging its subcontractors from engaging in their own communications. Thus, whether InterMoor acted wrongfully remains a question of fact for trial.

InterMoor next argues that US Wind cannot establish a possible future business relationship with any of its subcontractors, such as All Coast or McDonough, thus undermining US Wind's ability to prove causation. InterMoor presents testimony from McDonough that explains the reason a business relationship did not form was because US Wind did not accept McDonough's commercial terms. ECF 166-1 at 36–37. InterMoor also points to testimony from All Coast confirming that InterMoor did not threaten or prevent All Coast from contracting with US Wind. *Id.* at 38. In contrast, US Wind points to emails between McDonough and InterMoor, where InterMoor instructed that all requests from US Wind should be forwarded to InterMoor. Prior to this email exchange, McDonough had been providing quoted rates, but after this email exchange, McDonough no longer communicated directly with US Wind. A reasonable factfinder could infer from this evidence, collectively, that but for InterMoor's communication to its subcontractors, US Wind would have been able to directly negotiate with them. Thus, causation remains an open question of fact.

InterMoor's partial motion for summary judgment as to Count V is denied.

## VI.   CONCLUSION

For the reasons stated above, InterMoor's motion to impute knowledge of Graham Tyson to US Wind, ECF 167, will be GRANTED IN PART and DENIED IN PART; InterMoor's motion to exclude the testimony of Michael Frampton, ECF 168, will be DENIED; US Wind's motion in

limine to exclude the opinions of Scott C. McClure regarding the offshore wind industry, ECF 173, will be DENIED; and InterMoor's partial motion for summary judgment, ECF 166, will be GRANTED IN PART and DENIED IN PART.   Specifically, InterMoor's partial motion for summary judgement is granted as to Count I with respect to Section 7.1 of the Agreement, Count III, and Count IV.  InterMoor's partial motion for summary judgment is denied as to the remaining counts.

A separate Order follows.


Dated: November 14, 2022                                         _____/s/_____
                                                                Stephanie A. Gallagher
                                                                United States District Judge