## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| US WIND INC., | * | |
| Plaintiff / Counter-Defendant | * | |
| v. | * | Civil Case No. SAG-19-02984 |
| INTERMOOR, INC., | * | |
| Defendant / Counter-Plaintiff. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### <u>MEMORANDUM OPINION</u>

Plaintiff US Wind Inc. ("US Wind") brought this action against Defendant InterMoor, Inc. ("InterMoor"), alleging in Count I of its Second Amended Complaint ("SAC") that InterMoor breached the Master Service Agreement ("MSA") between the parties to transport and install a meteorological tower off the Maryland shore. ECF 75-2. US Wind also alleged, in Count V, that InterMoor tortiously interfered with its prospective economic relationships. *Id.* InterMoor counterclaimed for US Wind's failure to pay invoices due under the MSA and, in the alternative, for quantum meruit. *See* ECF 34, 42. After a ten-day trial, a jury returned a verdict for US Wind on Counts I and V of the SAC and for InterMoor on its quantum meruit counterclaim. ECF 264.

Now pending before the Court are (1) InterMoor's Renewed Motion for Judgment as a Matter of Law and, Additionally or in the Alternative, Motion for a New Trial and Motion to Alter or Amend the Judgment, ECF 271, and (2) US Wind's Renewed Motion for Judgment as a Matter of Law, ECF 272. The Court has reviewed the motions, the oppositions thereto, and the replies. ECF 273, 275, 284, 285. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the following reasons, the Court GRANTS IN PART and DENIES IN PART InterMoor's Rule 50(b)

motion for judgment as a matter of law and its Rule 59 motions for a new trial and to alter or amend the judgment, and DENIES US Wind's renewed motion for judgment as a matter of law.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case is about the failed installation of a meteorological tower for an offshore wind farm near Ocean City, Maryland. US Wind, the developer of that wind farm, contracted with InterMoor on July 29, 2019, to transport its meteorological tower and associated equipment from Louisiana to the project site. Delays and challenging weather conditions ultimately led to US Wind calling off the project on September 26, 2019. US Wind then filed the instant suit on October 11, 2019, alleging InterMoor breached the MSA. ECF 1. On January 5, 2021, US Wind amended its Complaint to include a tortious interference claim against InterMoor for allegedly interfering with prospective economic relationships when US Wind attempted to retrieve its equipment following the failed installation. ECF 75-2. After litigation in multiple courts, US Wind eventually recovered its equipment and continued litigating this action.

The ten-day jury trial began on October 2, 2023, and concluded on October 16, 2023. Pursuant to Federal Rule of Civil Procedure 50(a), US Wind and InterMoor each made motions for judgment as a matter of law before submitting the case to the jury. The Court reserved its decisions on these motions. *See* FED. R. CIV. P. 50(b); Trial Tr. Vol. VIII at 44:5–7; *id.* at 189:6–10. After deliberating for two days, the jury found that InterMoor breached four provisions of the MSA and tortiously interfered with US Wind's prospective economic relationships with two subcontractors. ECF 264. The jury awarded US Wind $4,060,811.09 in compensatory damages for its contract claim plus $807,752.20 in compensatory damages and $750,000 in punitive damages for its tortious interference claim for a total amount of $5,618,563.29. *Id.* For InterMoor's quantum meruit counterclaim, the jury awarded damages in the amount of $859,224.99. *Id.*

The parties have now renewed their Rule 50 motions, and InterMoor has also filed, in addition or in the alternative, Rule 59 motions for a new trial and to alter or amend the judgment. *See* FED. R. CIV. P. 50(b), 59.

## II.   LEGAL STANDARDS

### A.  Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 provides for two types of motions for judgment as a matter of law in civil actions tried before a jury. The first, pursuant to Rule 50(a), provides litigants the opportunity to obtain a judgment as a matter of law prior to an issue's submission to the jury. If, after a party "has been fully heard on an issue," and the court determines "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may enter judgment against that party. FED. R. CIV. P. 50(a)(1). The Rule further specifies that the motion "may be made at any time before the case is submitted to the jury," and "must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.* 50(a)(2). With regards to specificity, the moving party must, "either in written or oral argument, provide[ ] sufficient notice to his opponent of the alleged deficiencies in the opponent's case." *Wallace v. Poulos*, 861 F. Supp. 2d 587, 595 (D. Md. 2012).

Rule 50(b) provides litigants the opportunity to renew their previous motion for judgment as a matter of law made under Rule 50(a). Specifically, Rule 50(b) provides that if a party's Rule 50(a) motion is unsuccessful, then, within twenty-eight days of the jury's verdict, the party may renew its motion for judgment as a matter of law. FED. R. CIV. P. 50(b). As is apparent from the Rule's text, the court can entertain a Rule 50(b) motion only if the moving party made a Rule 50(a) motion before the court submitted the case to the jury. *See, e.g.*, *Price v. City of Charlotte*, 93 F.3d 1241, 1248–49 (4th Cir. 1996). If properly presented to the court, then the court may "(1) allow

judgment on the verdict, if the jury returned a verdict, (2) order a new trial, or (3) direct the entry

of judgment as a matter of law." FED. R. CIV. P. 50(b).

In considering a motion for judgment as a matter of law under Rule 50, the court is

"compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them."

*Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001) (quoting *Price*, 93 F.3d at 1250).

The Court must view the evidence "in the light most favorable to the non-moving party," *id.*,

"without weighing [its] credibility," *Chaudhry v. Gallerizzo*, 174 F.3d 394, 405 (4th Cir. 1999).

The court may only grant the motion if "there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 149 (2000) (quoting FED. R. CIV. P. 50(a)).

**B.  Motion for a New Trial[1]**

Federal Rule of Civil Procedure 59(a)(1)(A) provides that either party may petition the

court for a new trial "on all or some of the issues" after a jury trial "for any reason for which a new

trial has heretofore been granted in an action at law in federal court." On a Rule 59 motion, the

court must "grant a new trial if (1) the verdict is against the clear weight of the evidence, or (2) is

based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there

may be substantial evidence which would prevent the direction of a verdict." *Knussman v.*

*Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane*

*Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). The first two prongs require a "comparison

of the factual record and the verdict to determine their compatibility." *Atlas Food Sys.*, 99 F.3d at

594. In this analysis, the court's review of the jury's factual determinations is limited to "whether

---

[1] Because the Court has not yet entered an order of judgment, it need not discuss the standards for
motions to alter or amend the judgment under Rule 59(e).

the jury's verdict is against the weight of the evidence or based on evidence which is false." *Id.* Ultimately, the decision of whether to grant a new trial "rests within the sound discretion of the trial court but such discretion must not be arbitrarily exercised." *City of Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960).

### III.   DISCUSSION

Both parties challenge several aspects of the jury's verdict. In its Rule 50(b) motion, InterMoor argues there is no legally sufficient evidentiary basis to uphold the jury's verdict on US Wind's contract and tortious interference claims. InterMoor's Rule 59 motions seek to amend or alter the jury's award of damages for US Wind's contract claim, or, alternatively, a new trial on this issue, as well as a new trial on its own breach of contract counterclaim. US Wind's motion renews its contention that it is entitled to judgment as a matter of law on InterMoor's quantum meruit counterclaim. The Court begins with InterMoor's motions.

### A.  InterMoor's Motion for Judgment as a Matter of Law

#### i.  Count I: Breach of Contract

To prevail on its breach of contract claim, US Wind had to prove that: (1) an agreement existed; (2) US Wind adequately performed the MSA; (3) InterMoor breached the MSA; and (4) US Wind suffered damages resulting from InterMoor's breach. *In re Chester J. Marine LLC*, 636 B.R. 704, 715 (Bankr. E.D. La. 2021). InterMoor primarily disputes elements three and four, asserting that the evidence failed to demonstrate that InterMoor breached Sections 8.6, 9.1, or 10 of the MSA or that any breaches of Sections 8.2, 8.6, or 9.1 of the MSA caused US Wind's damages. *See* ECF 271-1 at 13–21.

The Court begins and ends with Section 8.6 of the MSA, finding the evidence legally sufficient for a reasonable jury to conclude that InterMoor breached that provision and that the breach caused US Wind's damages. Section 8.6 states:

> [InterMoor] acknowledges it is generally familiar with, and understands, the nature of the Work, the environment, and the difficulties that may be incident to performing the Work; and, upon arriving at the Work Site, but prior to commencing Work, [InterMoor] will conduct a reasonable inspection of the Work Site.

Joint Ex. 1. US Wind identifies several failures that evidence InterMoor's general unfamiliarity with the items in Section 8.6, such as InterMoor's failure to (1) consult weather data; (2) independently assess the suitability of the project's lift boat, the *Great White*; or (3) review the *Great White*'s marine operations manual. *See* ECF 275 at 10; Trial Tr. Vol. VIII at 94:12–15 (US Wind's closing argument). InterMoor disputes that it failed to perform these tasks, but argues that even if it did, the evidence does not support a breach of Section 8.6. ECF 284 at 6. InterMoor separately argues US Wind adduced no evidence of historic or actual weather conditions at the project site and without such evidence, the jury could only speculate as to whether InterMoor's breach caused the project to fail. *See id.*; ECF 271-1 at 17.

The Court disagrees with InterMoor. First, the jury heard sufficient evidence that InterMoor's managers on the project failed to analyze the weather at the project site, independently assess the suitability of the *Great White*, and review that vessel's operations manual. *See, e.g.*, Trial Tr. Vol. IV at 146:7–17 (dep. testimony of Joao Ruiz) (weather analysis); *id.* at 139:19–21, 140:7–9 (suitability assessment); *id.* Vol. VI at 59:14–20 (operations manual); *id.* Vol. V at 35:7–15 (testimony of Brett Rhymes) (same). Second, the jury could have reasonably inferred that these

failures revealed a lack of "general familiarity" with the work when InterMoor signed the MSA.[2] For example, the project's manager, Joao Ruiz, testified that he did not need to independently review or perform a suitability survey of the *Great White* because the prior installation contractor had already deemed the vessel suitable for the work. Trial Tr. Vol. IV at 131:18–20, 132:6–8, 139:19–21. However, the existing suitability survey that the prior contractor performed contemplated the *Great White*'s arrival to the project site in late June. *See* Pl.'s Ex. 107. When the parties entered into the MSA on July 29, 2019, they knew that the *Great White* could not arrive onsite until mid-August. Def.'s Ex. 67; *see* Trial Tr. Vol. V at 190:5–191:4 (testimony of Graham Tyson); Joint Ex. 2. Thus, the jury could have reasonably inferred that InterMoor's failure to review or perform its own suitability analysis for the *Great White* evinced a lack of general familiarity with the work slated for later that summer. As another example, the evidence showed that the *Great White* was designed to operate in the Gulf of Mexico, not the North Atlantic, and that the two regions experience different sea bottom and weather conditions. *See* Pl.'s Ex. 4; Trial Tr. Vol. III at 59:19–24 (testimony of Mark Rice); *id.* Vol. VI at 23:1–5, 42:2–4 (testimony of David Martyn). The jury then heard expert testimony that these regional differences required an update to the *Great White*'s operations manual "to reflect the change of the operating area," and "take into account environmental and operating conditions in the North Atlantic." Trial Tr. Vol. VI at 21:2–6 (testimony of David Martyn); *see* Pl.'s Ex. 238. Therefore, the jury could have also reasonably inferred that InterMoor's failure to review the *Great White*'s operations manual

---

[2] This Court previously observed that "general familiarity" is an "amorphous standard and a low bar," and that post-MSA conduct may evidence a general unfamiliarity that existed at the time the parties signed the MSA. *See* ECF 194 at 27.

revealed general unfamiliarity with the offshore Maryland environment and any difficulties incident to performing the installation there.

Finally, the Court finds the evidence sufficient for a reasonable jury to conclude that InterMoor's breach of Section 8.6 caused the project to fail and resulted in US Wind's damages. The jury heard testimony and received evidence that the weather off the Atlantic coast normally deteriorates in September. *See, e.g.*, Trial Tr. Vol. V at 96:4–6 (testimony of Brett Rhymes); *id.* at 184:5–11 (testimony of Graham Tyson); *see also* Def.'s Ex. 130. The jury also heard testimony from US Wind's country manager and in-house counsel, Salvo Vitale, that he and "everyone else" understood that existing delays pushed the project into worse weather windows. Trial Tr. Vol. II at 186:3–6. Vitale soon thereafter testified that if InterMoor had spoken with the *Great White*'s captain before beginning the project and informed US Wind that the captain harbored doubt about operating the vessel in September weather conditions, then US Wind would have worked to "find a solution." *Id.* at 196:4–10. The jury was entitled to credit Vitale's testimony, and infer from it, that the project would have succeeded if InterMoor (and subsequently US Wind) learned of the captain's interpretation of the *Great White*'s operational limits well before the vessel arrived onsite in mid-September. Indeed, when viewed in the light most favorable to US Wind, the testimony and evidence adduced at trial was sufficient for the jury to find that InterMoor's breach of Section 8.6 caused the project to fail and caused US Wind's damages. *See X Techs., Inc. v. Marvin Test Sys. Inc.*, 719 F.3d 406, 413 (5th Cir. 2013) (upholding a denial of a directed verdict as to causation where "[t]here [we]re sufficient facts for the jury to infer that" had the defendant not breached the contract, the plaintiff would not have suffered damages).

Because the Court finds the evidence relating to Section 8.6 sufficient to uphold the jury's breach of contract verdict, the Court need not examine the other MSA provisions the jury

concluded were breached. The Court therefore must deny InterMoor's motion for judgment as a matter of law as to Count I.

### ii. Count V: Tortious Interference with Prospective Economic Relationships

To prevail on its claim for tortious interference with prospective economic relationships, US Wind had to prove that (1) InterMoor committed intentional and willful acts; (2) the acts were calculated to cause damage to US Wind in its lawful business; (3) the acts were done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of InterMoor (which constitutes malice); and (4) US Wind's actual damage and loss resulting. *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994) (quoting *Willner v. Silverman*, 71 A. 962, 964 (Md. 1909)). "In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought." *Philips N. Am. LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *14 (D. Md. Sept. 9, 2020) (quoting *Med. Mut. Liab. Soc'y of Md. v. B. Dixon Evander & Assocs., Inc.*, 660 A.2d 433, 439–40 (Md. 1995)). "In order to establish causation in a wrongful interference action, the plaintiff must prove the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *Med. Mut. Liab. Soc'y of Md.*, 660 A.2d at 439. Thus, causation required that US Wind "identify a possible future relationship which is likely to occur, absent the inference, with specificity." *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 546 (D. Md. 2006); *see id.* at 542 ("[A] 'reasonable probability' must be shown that a 'contract will arise from the parties' current dealings.'" (quoting RESTATEMENT (SECOND) OF TORTS § 766B reporter's note (AM. L. INST. 1979)). Causation also required US Wind to prove "not only that the same loss *might* have happened, but that it *must* have happened if the act complained of had not been done." *Med. Mut. Liab. Soc'y of Md.*, 660 A.2d at

440 (emphases in original) (quoting *Balt. & Potomac R.R. Co. v. Reaney*, 42 Md. 117, 137 (1874)). Finally, even with proof of causation, US Wind also had to prove "that any damages [were] a 'natural, proximate and direct effect of the tortious misconduct.'" *Id.* at 439 (quoting *Jones v. Malinowski*, 473 A.2d 429, 435 (Md. 1984)). Any such damages must have been "actual, not speculative, remote, or uncertain." *Sugarman v. Liles*, 190 A.3d 344, 369 (Md. 2018).

US Wind alleged at trial that InterMoor intentionally and willfully prevented US Wind from contracting directly with MARMAC, LLC d/b/a McDonough Marine Services ("McDonough") and All Coast, LLC ("All Coast") to facilitate the return of US Wind's equipment immediately after US Wind terminated the project.[3]  As evidence of malicious intent, US Wind points to InterMoor's refusal to comply with US Wind's request to offload its equipment in Baltimore; InterMoor's directives to McDonough and All Coast to promptly return to Louisiana; an email from InterMoor's commercial manager, Carrie Adams, describing InterMoor's intent to hold the meteorological tower "hostage" until US Wind paid its invoices; and US Wind's inability to locate McDonough's barge after project termination because a transponder had been turned off. *See* ECF 275 at 17–18; Trial Tr. Vol. III at 103:3–17 (testimony of Mark Rice). InterMoor argues that this evidence is legally insufficient to show wrongful conduct or intent because InterMoor acted in its own business interests, as it faced mounting costs associated with the two contracted vessels after US Wind terminated the project. *See* ECF 271-1 at 22. InterMoor also contends that US Wind failed to prove that any wrongful act caused US Wind to lose commercial opportunities

---

[3] McDonough owned the barge that carried the meteorological tower, and All Coast owned the *Great White*, which carried US Wind's alignment frame. *See* Joint Exs. 3, 4; Trial Tr. Vol. III at 104:10–13, 23–25 (testimony of Mark Rice).

with All Coast or McDonough and that US Wind adduced no evidence of any actual damages it suffered because of InterMoor's tortious interference. *See id.* at 21–29.

The Court agrees with InterMoor insofar as the record lacks sufficient evidence of causation and damages to sustain the jury's verdict as to US Wind's tortious interference claim. As to causation, US Wind introduced evidence that it desired to pay McDonough and All Coast directly to retrieve its property soon after it terminated the project on September 26, 2019. *See* Pl.'s Ex. 372; Joint Ex. 8 at 29:14–17 (June 7, 2022, Dep. Tr. of Patrick Stant). However, this evidence fails to demonstrate that a commercial relationship with either entity was "likely to occur" or reasonably probable. *See Baron Fin. Corp.*, 471 F. Supp. 2d at 542, 546. All Coast's president, Byron Allemand, did not recall any negotiations with US Wind to unload the alignment frame aboard the *Great White*. Dep. Tr. of Byron Allemand at 217:14–20; *see also* Trial Tr. Vol. II at 58:24–59:6 (testimony of Salvo Vitale) (explaining that he could not remember if he had any conversations with All Coast about getting US Wind's equipment back). Allemand also testified that he did not prefer to contract directly with US Wind, given concerns about US Wind's payments to prior contractors. *See* Dep. Tr. of Byron Allemand at 180:24–181:10. McDonough's president, Patrick Stant, testified that he spoke to US Wind around the time of project termination only on "an informatory basis" and that McDonough was "not negotiating with U.S. Wind" because it was "a subcontractor of InterMoor." Joint Ex. 8 at 29:21–22, 30:25–30:1; *see also* Trial Tr. Vol. II at 70:10–21 (testimony of Salvo Vitale) (explaining that he could not recall, and was not aware of, any direct conversations between US Wind and McDonough immediately following project termination). Stant further explained that even if US Wind and McDonough could work out a direct charter agreement to rent the barge, it would be impossible to do so without "the full permission and notice and approval of InterMoor," because McDonough's "contract was with

InterMoor," and McDonough had no interest in "canceling or attempting to cancel contracts." [4]

Joint Ex. 8 at 44:20–45:1; Joint Ex. 4; *see also* Trial Tr. Vol. III at 136:5–12 (testimony of Mark

Rice) (noting that, in his thirty-plus years of experience in the maritime industry, he had not

experienced a situation where one company leased the same barge to two different companies at

the same time). Thus, neither business relationship was "likely to occur." *Baron Fin. Corp.*, 471

F. Supp. 2d at 546.

US Wind also failed to show that any prospective commercial relationship US Wind lost

with McDonough or All Coast was an inevitable consequence of InterMoor's allegedly tortious

conduct or that any agreements would have happened if not for InterMoor. *Med. Mut. Liab. Soc'y

of Md.*, 660 A.2d at 440. For example, on October 8, 2019, US Wind expressed an unwillingness

to contract with McDonough and store the barge in Baltimore over the winter even "assuming we

could get InterMoor to release it," because "the cost was very high." Def.'s Ex. 194. Then, after

InterMoor released McDonough's barge from the charter agreement on January 30, 2020, US

Wind declined McDonough's quotes to unload the meteorological tower in North Carolina (where

the tower had been idling due to legal proceedings), because "McDonough requested an

exceedingly high price." Trial Tr. Vol. II at 65:11–19 (testimony of Salvo Vitale); *see id.* at

222:21–223:9 (noting that what McDonough asked to re-rent the barge "was unfair"); *see also*

---

[4] That InterMoor refused to cancel its existing contracts does not evidence malicious intent as a matter of law. *See Lyon v. Campbell*, 707 A.2d 850, 861–62 (Md. 1998) (noting that a person cannot be liable for tortious interference by refusing to do what it had the right to refuse to do, even if the refusal causes the plaintiff to lose an opportunity). Furthermore, had US Wind wrongfully induced McDonough to terminate its existing contract with InterMoor, it would have been US Wind who could have been liable to InterMoor for tortious interference with contractual relations. *See Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 301 (Md. 1994).

Joint Ex. 8 at 112:9–14.[5] In other words, US Wind found McDonough's rates unreasonable even when it had a chance to enter a business relationship. The record, therefore, simply does not permit a reasonable jury to find that any commercial relationship was likely to occur or "must have" occurred absent InterMoor's tortious interference. *See Lyon v. Campbell*, 707 A.2d 850, 863 (Md. 1998) ("[C]ausation evidence that is wholly speculative is not sufficient."). Thus, the Court must vacate the jury's verdict, including its award of punitive damages, regarding US Wind's tortious interference claim.

Even if the evidence had permitted a reasonable jury to find causation, the Court would still set aside the verdict because US Wind failed to prove any compensatory damages arising from the tortious interference. The only non-speculative evidence of damages US Wind adduced at trial was a tabular summary of invoices US Wind paid from July 26, 2019, to October 6, 2021. *See* Pl.'s Ex. 594. This table reflected total damages of $4,060,811.09 and made no distinction between those damages attributable to InterMoor's breach of contract or its alleged tortious interference. The jury awarded the full amount of $4,060,811.09 as compensatory damages for US Wind's breach of contract claim *plus* another $807,752.20 as compensatory damages for its tortious interference claim. Without any evidence regarding any additional harm US Wind allegedly suffered due to InterMoor's tortious interference, the jury could not have reasonably awarded US Wind another $800,000 in compensatory damages for that claim.

---

[5] Notably, back in July, 2019, US Wind did not have "the necessary insurances to charter the tug and the barge." Trial Tr. Vol. V at 129:21–23 (testimony of Graham Tyson). US Wind offered no evidence showing that it had procured the insurance needed to enter into any direct charter agreements by September, 2019, or by January, 2020.

US Wind claims that it "provided evidence of actual damage" from its inability to contract with All Coast or McDonough, but cites only to Salvo Vitale's purely speculative and uncertain testimony about the "financial as well as reputational damages" US Wind suffered. *See* ECF 275 at 20. When asked whether US Wind's inability to retrieve its meteorological tower impacted other relationships associated with the larger offshore wind project, Vitale answered, "Of course," but failed to name an actual source of financing, did not identify what kind of financing would have been available to the company, and provided no indication as to whether access to any such financing was reasonably certain to occur. *See* Trial Tr. Vol. II at 37:8–15, 84:23–85:8. Vitale also suggested that because the meteorological tower remains unused in Louisiana, there are "higher costs of financing [and] reputational damages," but neither he nor anyone else at trial testified as to what those higher costs or reputational damages actually were. *Id.* at 83:19–23. And when probed by counsel to explain reputational damages, Vitale suggested one should "[i]magine a developer losing $8 million equipment." *Id.* at 83:24. Although it is impossible to know how the jury calculated the damages it assessed for InterMoor's tortious interference, the lack of evidence demonstrates that it did so on a purely speculative basis. *See Sugarman v. Liles*, 190 A.3d 344, 369 (Md. 2018). Accordingly, InterMoor is entitled to judgment as a matter of law as to US Wind's tortious interference claim.

**B.  InterMoor's Rule 59 Motions**

### i.      InterMoor's Breach of Contract Counterclaim

In addition, or in the alternative, InterMoor asks this Court to grant a new trial as to its own breach of contract claim, arguing that the clear weight of the evidence demonstrated that US Wind breached the MSA by failing to pay for the work InterMoor performed. As with US Wind's contract claim, InterMoor's counterclaim required it to prove that (1) an agreement existed; (2)

InterMoor adequately performed the MSA; (3) US Wind breached the MSA; and (4) InterMoor sustained damages. *In re Chester J. Marine LLC*, 636 B.R. 704, 715 (Bankr. E.D. La. 2021). InterMoor emphasizes US Wind's agreement to pay InterMoor on a cost-plus basis as the project progressed and points to the "uncontroverted" testimony that US Wind failed to pay InterMoor for the work it performed. ECF 271-1 at 29–30. US Wind counters that, with the jury's findings of breach against InterMoor in Count I, the jury could also have reasonably found that InterMoor failed to adequately perform its obligations under the MSA. *See* ECF 275 at 24.[6]

    The jury's verdict against InterMoor on its contract claim was not against the clear weight of the evidence. There was conflicting testimony not only as to whether InterMoor breached various provisions of the MSA, but also as to when those breaches occurred. For example, the jury heard testimony from InterMoor's offshore construction manager that review of the lift boat's operational limits, contained in the vessel's operations manual, would occur at "the very beginning" of a project and through the life of the project. Trial Tr. Vol. V at 37:14–25 (testimony of Brett Rhymes). US Wind's expert, Michael Frampton, also testified that suitability surveys and full reviews of a vessel's marine operations manual should occur "both at the planning stage and . . . going forward as the project progresses." *See* Trial Tr. Vol. VII at 5:12–17, 12:18–13:10; *see id.* at 32:1–32:4. With this testimony and having been duly instructed on the parties' contract claims, the jury could have reasonably found that InterMoor breached Section 8.6 (or other provisions) of the MSA before the project officially got underway and before InterMoor performed any work for which it sought payment, thus discharging US Wind from performing its payment obligations under the MSA. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134

---

[6] US Wind also suggests the invoices in the record were disputed. *See* ECF 275 at 24. The Court need not reach this issue.

S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.") (citation omitted). Again, the Court cannot and does not speculate as to why the jury reached its verdict, but its decisions as to either party's contract claims did not contradict the great weight of the evidence presented at trial. *See Daughety v. U.S. Dep't of the Army*, Case No. CBD 04-2114, 2007 WL 9754293, at *3 (D. Md. Feb. 16, 2007). Therefore, the Court must sustain the jury's verdict as to InterMoor's contract-based counterclaim.

ii.    **US Wind's Damages Award**

InterMoor also asserts two reasons to reduce the jury's award of damages for US Wind's breach of contract claim. First, InterMoor argues that the jury's award was against the clear weight of the evidence and would result in a miscarriage of justice because the MSA limits the amount of damages US Wind may recover to only those "as a result of [the MSA's] termination," not those incurred prior to termination. ECF 271-1 at 32. Second, InterMoor contends that US Wind's damages should be reduced by $400,000, which represents the amount US Wind received from a prior party to this suit pursuant to a settlement agreement. *Id.* at 33–34.

**1. Reduction of Damages Based on the MSA**

InterMoor explains that US Wind terminated the MSA on September 26, 2019, pursuant to the MSA's default termination provision. *See* Def.'s Ex. 188. That provision states, in relevant part:

> In the event [US Wind] terminates this Agreement or any Work Order due to [InterMoor]'s default, [InterMoor] shall be entitled to payment as set out in Article 6 for the portion of the Work performed in accordance with this Agreement and the applicable Work Order. Any additional costs reasonably incurred by [US Wind] as a direct result of such termination shall be recoverable from [InterMoor], up to a maximum twenty-five percent (25%) of the amount that [InterMoor] would have been paid if it had completed the work.

16

Joint Ex. 1 (Section 4.3). According to InterMoor, the final sentence of this provision limits US Wind's damages to those suffered after September 26, 2019, and the evidence presented at trial showed that US Wind incurred only $1,234,267.86 in expenses after that date.

The Court sees no basis to intrude upon the jury's award based on Section 4.3 of the MSA. Initially, this Court disagrees with InterMoor's contention that Section 4.3 precludes US Wind from recovering any pre-termination damages. Section 4.3 simply restricts the amount of post-termination additional costs that could be recoverable. Also, at trial, InterMoor presented no evidence that this provision limited US Wind's damages in the manner it suggests. The only witness who testified about Section 4.3 explained that it "does not set a limit" and that the provision established "in which manner the additional costs can be recovered from [InterMoor]." Trial Tr. Vol. II at 171:8–10 (testimony of Salvo Vitale). The jury heard nothing at trial, save for brief argument from InterMoor's counsel, that the MSA limited US Wind to damages incurred post-termination. *See id.* Vol. VIII at 165:14–19, 166:24–167:12 (InterMoor's closing argument). The jury's award, then, was neither against the clear weight of the evidence, nor would it result in a miscarriage of justice.

### 2. Reduction of Damages Based on US Wind's Settlement with AGM

The Court does agree with InterMoor that it should reduce the jury's verdict by the amount that US Wind received from American Global Maritime, Inc. ("AGM") to settle similar claims in this case. *See* ECF 194 at 1 n.1. In opposition, US Wind alleges that InterMoor failed to introduce evidence at trial about this settlement and its resulting effect on any judgment, but this argument plainly ignores the procedural history, US Wind's own pretrial positions, and the Court's rulings on this matter. To start, US Wind alleged in the parties' pretrial order that InterMoor and AGM shared liability to US Wind for over $1.5 million in damages. ECF 221 at 32. US Wind also agreed

with InterMoor that evidence of its settlement with AGM should be excluded at trial. ECF 212 at 1 (noting "the existence of its previous settlement with [AGM] alone would not be relevant" and that settlement agreements are "generally excluded as evidence" pursuant to Federal Rule of Evidence 408); *see* ECF 207 at 7–9. Finding the issue undisputed, the Court granted InterMoor's motion *in limine* to exclude evidence of the AGM settlement. ECF 228 at 2. The Court then confirmed at trial that this evidence would not be for the jury to consider as it assessed damages. Trial Tr. Vol. III at 23:7–12 (bench conference); *see also id.* Vol. VII at 166:14–25 (charge conference) (rejecting InterMoor's proposed jury instruction on its affirmative defense for offset because it would be "appropriately handled in the judgment" and noting the matter for record). It is therefore wholly inconsistent for US Wind to claim now, in post-trial briefing, that the Court should deny InterMoor's request for offset on the basis that InterMoor failed to present evidence at trial about the AGM settlement.

Now that the issue is ripe, the Court finds it appropriate to reduce US Wind's damages by $400,000. Texas courts apply the "one satisfaction rule," which "prevent[s] a plaintiff from obtaining more than one recovery for the same injury." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107 (Tex. 2018) (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)); *see also Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 738–39 (4th Cir. 2000) (discussing and applying the one satisfaction rule to offset damages in an admiralty case). The one satisfaction rule allows a nonsettling defendant to credit or offset its liability by an amount the plaintiff already received in settlement for "a single, indivisible injury." *Id.* Without this offset, "[t]he plaintiff would otherwise be recovering an amount greater than the trier of fact has determined would fully compensate for the injury." *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993) (citation omitted).

Texas courts are also clear that to enforce the one satisfaction rule, a court must apply a burden-shifting framework. Initially, the nonsettling defendant has the burden to prove its right to a settlement credit. *Mendez*, 555 S.W.3d at 107. The nonsettling defendant "meets this burden by introducing into the record either the settlement agreement or some other evidence of the settlement amount." *Id.* (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998)). "Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement's allocation." *Id.* (quoting *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002)). "The plaintiff can rebut the presumption . . . by presenting evidence showing that the settlement proceeds are allocated among defendants, injuries, or damages such that entering judgment on the jury's award would not provide for the plaintiff's double recovery." *Id.* at 107–08. This framework ensures "the plaintiff is in the best position to demonstrate why rendering judgment based on the jury's damages award would not amount to the plaintiff's double recovery." *Id.* at 108 (internal quotation marks omitted).

Application of this burden-shifting framework here reveals that InterMoor is entitled to offset its liability by $400,000. InterMoor has pointed the Court to the existence of the settlement agreement in an amount of $400,000 between US Wind and AGM. Def.'s Ex. 254. US Wind does not dispute the amount, only that InterMoor failed to introduce evidence "that indicated that the settlement amount was paid for damages for which AGM and InterMoor were jointly and severally liable." ECF 275 at 27. However, US Wind has offered no evidence to rebut the presumption that InterMoor is entitled to a settlement offset in this amount. *See Mendez*, 555 S.W.3d at 107–08. US Wind has also failed to explain why InterMoor should not be entitled to a $400,000 offset when US Wind previously represented to this Court that InterMoor was "jointly and severally liable"

with AGM for more than $1.5 million of US Wind's damages. *See* ECF 221 at 32; *Mendez*, 155

S.W.3d at 111 (finding a settlement offset appropriate where the plaintiff "never offered any

evidence regarding any allocation of the settlement proceeds"). Because InterMoor met its burden

and US Wind did not, InterMoor is entitled to offset its liability by the entire settlement amount.[7]

### C.  US Wind's Motion for Judgment as a Matter of Law

As an alternative to its breach of contract counterclaim, InterMoor submitted a claim for

quantum meruit to the jury. A successful claim for quantum meruit requires a plaintiff to prove

that it (1) provided valuable services and/or materials (2) for the defendant; (3) which the defendant

accepted; and (4) under such circumstances as reasonably notified the defendant that the plaintiff,

in performing, expected to be paid by the defendant. *See, e.g.*, *Vortt Expl. Co. v. Chevron U.S.A.,

Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). US Wind asserts it is entitled to judgment as a matter of

law on InterMoor's quantum meruit claim for three reasons. First, the existence of an enforceable

contract bars InterMoor from recovering under a theory of quantum meruit and no exception to

that general rule applies because US Wind neither breached the MSA nor accepted or retained

InterMoor's services.[8] Second, as a procedural matter, InterMoor was not entitled to seek damages

---

[7] US Wind also suggests that settlement offsets or credits are only allowed "in limited instances
such as personal injury and wrongful death cases." ECF 275 at 27 (citing TEX. CIV. PRAC. & REM.
CODE § 33.012). *Mendez*, however, made clear that the one satisfaction rule is not limited to tort
claims, "because whether it applies depends not on the cause of action asserted, but on the injury
sustained." 555 S.W.3d at 113; *see also id.* ("[T]he one satisfaction rule is consistent with
principles of contract law, which preclude a non-breaching party from recovering damages for
breach of contract that would put the non-breaching party in a better position than if the contract
had been performed." (quoting *Metal Bldg. Components LP v. Raley*, No. 03-05-00823-CV, 2007
WL 74136, at *19 n.1 (Tex. App. Jan. 10, 2007))).

[8] US Wind suggests that it also makes this argument under Rule 59, contending that "the jury made
an error in awarding damages to InterMoor under quantum meruit since none of the three
exceptions exist in this case." ECF 272-2 at 8; ECF 285 at 6 n.1. This is a legal contention and is
adequately addressed by the standards of Rule 50.

under quantum meruit from the jury because it had to elect its remedies at trial and chose to submit its claim for contract damages to the jury. Finally, US Wind contends that InterMoor failed to present sufficient evidence of the reasonable value of its services and materials it furnished to US Wind. InterMoor responds that US Wind waived its first and third arguments by failing to raise them when it made its Rule 50(a) motion at trial. InterMoor then asserts that it did not need to elect between remedies at trial, that it may recover in quantum meruit despite the existence of a contract because US Wind accepted or retained InterMoor's services, and that it presented legally sufficient evidence of damages to sustain the jury's award. The Court begins with the procedural issues before proceeding to the merits of InterMoor's counterclaim.

### i.    Waiver

The Court rejects InterMoor's contention that US Wind waived its first and third arguments in its Rule 50(b) motion. US Wind satisfied the Court's clear and basic instructions following the charge conference to "cursorily make" and "[v]ery briefly" provide the legal basis for each Rule 50(a) motion. Trial Tr. Vol. VIII at 43:9, 44:23. The parties agreed with the Court's succinct approach to making their Rule 50(a) motions, understanding that they placed their motions on the record and would provide full argument to the Court at a later time. *See id.* at 44:8–11. Thereafter, US Wind made its Rule 50(a) motion on quantum meruit and noted two specific contentions that under Texas law, a contract forecloses a party's ability to recover in quantum meruit and that InterMoor had to elect its remedies at trial. *Id.* at 45:2–16. This Court's directives did not require

21

more.[9] *See id.* at 189:22–23 (confirming that "everyone made their motions" and "kn[e]w what the motions are going to be").

### ii.   Election of Remedies

The Court next rejects US Wind's argument that InterMoor had to elect between remedies at trial. Under federal and Texas law, the "election of remedies doctrine no longer requires a party to elect a single remedy at the outset of suit." *Homeland Training Ctr., LLC v. Summit Point Auto. Rsch. Ctr.*, 594 F.3d 285, 293 n.1 (4th Cir. 2010); *see also id.* (noting that "the sequencing component of [the] election of remedies doctrine would likely qualify as 'procedural' . . . and that therefore, the issue would likely be governed by federal law"); *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) ("A party is generally entitled to sue and to seek damages on alternative theories."). Procedural rules allow a party in a "liberal system of pleading . . . to state his claims or defenses alternatively or hypothetically . . . [such that] [i]f a party pleads more than one theory of recovery or defense, normally he need not elect between them until after verdict." *Deal v. Madison*, 576 S.W.2d 409, 421 (Tex. Civ. App. 1978) (citations omitted), *abrogated on other grounds by Cypress Creek Util. Serv. Co. v. Muller*, 640 S.W.2d 860, 866 (Tex. 1982). "Where, as here, several theories of recovery are pled, and the evidence is conflicting but is sufficient to raise a question of the existence of any or all of the theories, it is proper to submit issues to the jury on all theories raised." *Montclair Corp. v. Earl N. Lightfoot Paving Co.*, 417 S.W.2d 820, 829–30 (Tex. Civ. App. 1967).

---

[9] Moreover, US Wind objected to giving a quantum meruit jury instruction on the basis that the dispute was covered by an enforceable contract. *See* Trial Tr. Vol. VII at 169:6–19 (noting that InterMoor had the better argument under Texas law that quantum meruit may still be allowed notwithstanding an enforceable contract). Thus, InterMoor cannot claim that it lacked sufficient notice regarding that specific aspect of US Wind's Rule 50(a) motion.

The election of remedies doctrine only becomes relevant if a party "obtains jury findings favorable on two or more theories," in which case, the prevailing party "has the right to a judgment on the theory entitling it to the greatest relief." *AMS Sensors USA Inc. v. Renesas Elecs. Am., Inc.*, 554 F. Supp. 3d 870, 876 (E.D. Tex. 2021) (quoting *St. Paul Ins. Co. v. Rakkar*, 838 S.W.2d 622, 630 (Tex. App. 1992)), *appeal filed*, No. 22-2186 (Fed. Cir. Sept. 7, 2022); *see also Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 113 (Tex. App. 2012) ("Generally, it is the obtaining of a judgment on one theory or state of facts that precludes the ability to pursue other inconsistent remedies."). Thus, alongside the one satisfaction rule, the election of remedies doctrine "operates to prevent a plaintiff from recovering twice for the same wrong, not to prevent a plaintiff from recovering once." *Malvino v. Delluniversita*, 840 F.3d 223, 234 (5th Cir. 2016); *see Krobar Drilling L.L.C.*, 426 S.W.3d at 113 (Tex. App. 2012) ("The doctrine is meant to 'prevent a party who has obtained a specific form of remedy from obtaining a different and inconsistent remedy for the same wrong.'" (quoting *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 541 (Tex. 1987))).

US Wind fails to cite any authorities supporting its novel proposition that InterMoor had to elect between its breach of contract and quantum meruit claims at trial. In *Christus Health v. Quality Infusion Care, Inc.*, the court reversed a jury's award for quantum meruit because the existence of a contract barred recovery in quantum meruit as a matter of law, not because the party had to elect between the two remedies at trial. 359 S.W.3d 719, 725 (Tex. App. 2011). In *Coon v. Schoeneman*, the court first explained that a party seeking contract damages and quantum meruit damages "may pursue both remedies in the same suit by alternative pleadings and make his election at trial," and made clear that the party asserting alternative theories was "entitled to go to the jury on his alternative plea." 476 S.W.2d 439, 441 (Tex. Civ. App. 1972). In short, InterMoor

possessed the right to submit its breach of contract and quantum meruit claims to the jury, and US Wind has failed to provide this Court with any authority to the contrary. *See Whittington v. City of Austin*, 456 S.W.3d 692, 710 (Tex. App. 2015) (rejecting the applicability of election of remedies in an eminent domain case where plaintiffs were "ultimately unsuccessful in their efforts to maintain ownership" but pursued "recovery under their alternative claim for compensation"); *Krobar Drilling, L.L.C.*, 426 S.W.3d at 114–15 (refusing to apply the election of remedies doctrine where a plaintiff alleged two distinct causes of action against different entities); *Drury S.W., Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 293 (Tex. App. 2011) (remanding for re-election of remedies where a jury found in favor of a party on multiple alternative theories of recovery).

### iii.    Recovery in Quantum Meruit Despite the Existence of an Enforceable Contract

Proceeding to the merits of InterMoor's quantum meruit claim, the Court finds the evidence legally sufficient to uphold the jury's verdict in favor of InterMoor. Under Texas law, "[a] party generally cannot recover under quantum meruit where there is a valid contract covering services or materials furnished." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (citation omitted); *see Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988). "The rationale behind this rule is that parties should be bound by their express agreements and that recovery under an equitable theory is generally inconsistent with the express agreement when a valid agreement already addresses the matter." *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 620–21 (Tex. App. 2006). However, damages in quantum meruit may still be available if one of the three following exceptions apply: (1) the plaintiff has partially performed an express contract, but because of the defendant's breach, the plaintiff could not complete the contract; (2) the plaintiff partially performed a unilateral contract; or (3) the plaintiff breached a construction or building contract and defendant accepted and retained "the benefits arising as a direct result of the

contractor's partial performance." *Truly*, 744 S.W.3d at 936–37; *see also Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 345 (Tex. 1995). On the third exception, US Wind now disputes that (1) the MSA was a construction contract, ECF 285 at 7, and (2) US Wind accepted, used, or enjoyed any benefits from InterMoor's partial performance, *see* ECF 272-2 at 6–7.

As to the MSA, US Wind never contested, during or before trial, whether the MSA was a construction contract. This Court therefore deems this argument forfeited.[10] In any event, there is little doubt that the contract for the "transportation and installation" of the meteorological tower involved construction. *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "construction" as "[t]he act of building by combining or arranging parts of elements; the thing so built"); *see also Balfour Beatty Rail Inc. v. Kansas City S. Ry. Co.*, Civ. No. 3:10-cv-1629-L, 2012 WL 3100833, at *11 (N.D. Tex. July 31, 2012) ("[T]he construction of a written instrument is a question of law for the trial court.").

As to US Wind's second contention, the Court finds the evidence legally sufficient to sustain the jury's verdict that US Wind accepted the benefits of InterMoor's partial performance. No doubt the project failed, in that InterMoor did not install the meteorological tower. The jury could still reasonably find, however, that US Wind accepted critical services from InterMoor. For example, after the prior installation contractor declared bankruptcy in July, 2019, US Wind needed

---

[10] Notably, US Wind previously represented to this Court that the MSA involved construction. *See* ECF 75-2 ¶ 10 (Second Amended Complaint) ("[A] Met Mast needed to be *constructed* and installed in the proposed wind farm area." (emphasis added)); ECF 221 at 2 (US Wind's Statement of Facts) ("It was the parties' understanding that the scope of work document described the scope of work InterMoor was committing to perform under the terms of the MSA [and] [t]he Scope of Work described the 'Work' as the 'transport and installation of a single Meteorological Mast structure . . . that will initiate *construction* of a future Wind farm facility' [and] InterMoor 'will provide Installation project management [] to ensure that all offshore *construction* activities at the work location are coordinated' . . . ." (emphases added) (quoting Joint Ex. 2)).

InterMoor to charter the *Great White*, a tug, and the barge to carry the meteorological tower from Louisiana to Maryland because US Wind "didn't hold the necessary insurances to charter" these vessels and "didn't have the capabilities" to plan the transportation phase of the project. Trial Tr. Vol. V at 129:18–130:10 (testimony of Graham Tyson); Pl.'s Ex. 29. InterMoor, at US Wind's request, entered into charter agreements with All Coast, McDonough, and another subcontractor to charter these vessels. *See* Joint Exs. 3, 4; Pl.'s Ex. 364. The jury also heard evidence of other services InterMoor provided to US Wind, such mobilizing and transiting the material barge, overseeing the meteorological tower loading upon the barge, and providing comments on the installation plan for the meteorological tower as the vessels journeyed to Maryland. *See* Trial Tr. Vol. IV at 92:4–93:16 (testimony of Martin Kobiela); Trial Tr. Vol. VI at 51:2–16 (dep. testimony of Joao Ruiz). While US Wind argues that these tasks "did not result in a benefit to US Wind because InterMoor ultimately took the Met Mast back to Louisiana against US Wind's express instructions," ECF 285 at 7, the question of whether US Wind derived any benefit was for the jury to decide. *See STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 392 (Tex. App. 2013); *Colbert v. Dallas Joint Stock Land Bank*, 150 S.W.2d 771, 773 (Tex. Comm'n App. 1941); *Pearl Res. LLC v. Charger Servs., LLC*, 622 S.W.3d 106, 121 (Tex. App. 2020). Accordingly, judgment as a matter of law is not warranted on InterMoor's quantum meruit counterclaim.

### iv.    Sufficiency of the Evidence as to InterMoor's Quantum Meruit Damages

Finally, the Court finds the evidence legally sufficient to sustain the jury's award of $859,224.99 to InterMoor as its quantum meruit damages. "The measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed and the materials furnished." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018) (citation omitted). The "value" of the work performed means "the expenses incurred while providing those services

and materials." *PIC Realty Corp. v. Southfield Farms, Inc.*, 832 S.W.2d 610, 616 (Tex. App. 1992).

Further, "[w]hat constitutes a reasonable compensation for benefits furnished does not depend on

any single factor, but takes into account all the evidence and circumstances." *Walker & Assocs.*

*Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 859 (Tex. App. 2010). Thus, for evidentiary purposes,

"a claimant need not use the word 'reasonable'; a claimant need only present sufficient evidence

to justify a jury's finding that the costs were reasonable." *Brender v. Sanders Plumbing, Inc.*, No.

2-05-067-CV, 2006 WL 2034244, at \*4 (Tex. App. July 20, 2006).

US Wind claims that the invoices InterMoor offered at trial to prove its quantum meruit

damages were insufficient to show that the amounts charged represented a reasonable value of the

services and materials InterMoor furnished to US Wind. ECF 272-2 at 9–10. The totality of the

record, however contains ample evidence from which the jury could find InterMoor's expenses

reasonable. *See MMR Int'l Ltd., v. Waller Marine, Inc.*, Civ. No. H-11-1188, 2013 WL 6491186,

at \*10 (S.D. Tex. 2013); *Brender*, 2006 WL 2034244, at \*5. InterMoor submitted to US Wind

detailed invoices with the costs associated with specific project tasks, the individuals associated

with each activity, the hours each individual worked on particular days, and their hourly rates. *See*

*Brender*, 2006 WL 2034244, at \*5 (noting the itemized invoices containing hourly rates, the

number of hours each employee worked each day, the materials used, and the cost of the materials

as "more than merely the amounts charged"). Additionally, Exhibit A of the MSA delineated

prepayment terms and the cost-plus payment structure for chartering the *Great White* from All

Coast, procuring the supply vessels, securing offshore personnel services, and other tasks that

InterMoor would perform for the project. *See* Joint Ex. 1; *Montclair Corp. v. Earl N. Lightfoot*

*Paving Co.*, 417 S.W.2d 820, 831 (Tex. Civ. App. 1967) ("Certainly the contract price is

evidentiary of the reasonable value of what is furnished."); *Elec. Wire & Cable Co. v. Ray*, 456

S.W.2d 260, 263 (Tex. Civ. App. 1970) ("[T]he prices quoted [in a contract] are also evidence of the reasonable value of the materials and labor furnished." (citation omitted)). Exhibit A also contained costs that vendors already incurred based on US Wind's arrangement with the project's prior installation contractor, allowing the jury to infer that the rates subcontractors charged to InterMoor for post-MSA services were comparable to the rates they charged to US Wind before the MSA.[11] *See Brender*, 2006 WL 2034244, at *5 ("The billing rates reflected in [previous] invoices for prior work performed for [the plaintiff] also constitute some evidence that the same rates charged here were reasonable."). Indeed, many of the services that InterMoor invoiced to US Wind were simply pass-through costs InterMoor incurred from subcontracting with other vendors accompanied by a 10% or 15% markup, and a 3% management fee InterMoor charged for managing the project and processing invoices. *See, e.g.*, Def.'s Ex. 207; Trial Tr. Vol. VI at 161:8–20 (testimony of Carrie Adams); *id.* at 97:23–98:13. The reasonableness of those markups and fees became apparent when US Wind's consultant, Graham Tyson, testified not only that he determined the markup rates in the MSA, but also that he also found them "reasonable . . . considering the risk and responsibility" of subcontracting specific work streams. Trial Tr. Vol. V at 152:24–153:6; *see id.* at 153:10–11 (noting that InterMoor "need[ed] to make some money there to account for . . . a profit and the potential risks of performance"). Accordingly, when considering all of the evidence adduced at trial, the jury had a legally sufficient basis to determine the reasonable value of the services and materials InterMoor furnished to US Wind.

---

[11] For example, in Exhibit A of the MSA, All Coast charged $19,500 per day for the *Great White* operating on a standby basis from July 13 to July 26, 2019. Joint Ex. 1. In a separate invoice dated September 13, 2019, All Coast also charged $19,500 per day as the *Great White*'s charter rate during the project. *See* Def.'s Ex. 207.

IV.     CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART InterMoor's Renewed Motion for Judgment as a Matter of Law and, Additionally or in the Alternative, Motion for a New Trial and Motion to Alter or Amend the Judgment, ECF 271, and DENIES US Wind's Renewed Motion for Judgment as a Matter of Law, ECF 272. Judgment will be entered in favor of US Wind and against InterMoor as to (1) Count I of US Wind's SAC in the amount of $3,660,811.09 and (2) InterMoor's breach of contract counterclaim. Judgment will also be entered in favor of InterMoor and against US Wind as to (3) Count V of US Wind's SAC and (4) InterMoor's quantum meruit counterclaim in the amount of $859,224.99. A separate order follows.


Dated: March 11, 2024                                 _____/s/_____
                                                      Stephanie A. Gallagher
                                                      United States District Judge